UNITED STATES of America, Plaintiff-Appellee,

v.

Howard B. QUINN, Defendant-Appellant.

No. 16354.

United States Court of Appeals Seventh Circuit.

July 24, 1968.

Rehearing Denied Aug. 29, 1968.

Certiorari Denied Dec. 9, 1968.

See 89 S.Ct. 451.

George B. Collins, Chicago, Ill., for appellant.

Thomas A. Foran, U. S. Atty., Michael B. Nash, Asst. U. S. Atty., Edward V. Hanrahan, U. S. Atty., Chicago, Ill., for appellee, John Peter Lulinski, Gerald M. Werksman, Asst. U. S. Attys., of counsel.

Before SCHNACKENBERG, KILEY and FAIRCHILD, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Howard B. Quinn, defendant, has appealed from his conviction under count I of an indictment[1] sentencing him to three years imprisonment.

The charge against Quinn was that, in violation of § 657 Title 18, U.S.C., on April 3, 1963, he unlawfully and wilfully misapplied funds of the Beverly Savings and Loan Association (Beverly), by fraudulenting causing its check for $553,166.66 to be drawn and wilfully converting same to his own use, which check purportedly represented a four-

---

1. A prior conviction under all four counts of the indictment was reversed as to counts II and IV, United States v. Quinn, 7 Cir., 365 F.2d 256 (1967).

year prepayment[2] of rent by Beverly to Quinn Management Company.

Under date of February 6, 1962, Beverly had leased its premises from Quinn Management Company under a twenty-year lease[3] reserving an annual rental of $150,000 plus a percentage, which resulted in a total base rate of $3,000,000. Joseph Geisen, president of Beverly, and Miss Lana, its secretary, signed the lease for Beverly although it had not been approved by its board of directors.

Beverly moved into the new quarters in June, 1962. It occupied part of a nine-story building, which also contained other enterprises of Quinn. Prior to the prepayment of April 3, 1963, rent had been paid monthly, there had been no prepayment of rent, and there had been no security deposit.

Quinn was known to all concerned as the landlord of Beverly. He was a director and chairman of the board of directors of Beverly. He and his family owned about 66% of the Beverly stock, and Charlotte, his wife, was a director of the association. Quinn shared an office in the building with president Geisen. Defendant's control of Beverly's financial operations is shown in the evidence by his recommendation to increase the authorized outstanding shares of stock so as to meet its dividend which was approved at the February 23, 1963 meeting of the directors.

In early March, 1963, Quinn was notified by the mortgage holder of his building that his mortgage payments were then delinquent. Thereafter, on three separate occasions before the March 28, 1963 board meeting, Geisen and Quinn discussed the prepayment of rent by Beverly. Geisen testified he had specifically informed Quinn in these discussions that a prepayment of rent would jeopardize Beverly's liquidity position, undermine the association's security for mortgage payments, and would amount to nothing more than a loan to him by the association, which would not be proper.

Documentary evidence shows that the financial condition of Quinn's other businesses and companies was deteriorating and that, between March 28 and April 2, 1963, he or his wife had written checks totaling $314,249 on the Quinn Management Company account in the Pullman Bank in which there was a balance of only a few thousand dollars. This figure does not include a check for $236,585 used by Quinn to purchase recently issued shares of Beverly, which, when added to the $314,249, equalled $550,834 or only $2332.56 less than the $553,166.66 claimed to have been misapplied.

At the March meeting no motion was presented regarding any prepayment of rent nor was any approval given for any such prepayment, although Geisen testified that defendant stated to the board that, in considering a prepayment of rent, a 5% discount would be given. However, director Douglass objected that 5% would not be a proper return on the association's funds.

Gerald Ahern testified that he was comptroller and treasurer of Beverly and that on April 2, 1963, defendant told him "to draw a check for four years' prepayment of rent, and that this was approved by the board of directors at a recent meeting * * *." He also testified that he had two checks drawn payable to the La Salle National Bank, as trustee, aggregating in excess of $550,000, for four years prepayment of rent. These checks he gave to the office manager for Quinn. The next morning defendant told Ahern to take the checks and change the payee from the La Salle National Bank under a trust number to Quinn Management Company. Ahern

---

2. Although the indictment originally charged that this "prepayment" was made without the knowledge, consent and and approval of the board of directors, the district court struck that language as surplusage.

3. Executed by La Salle National Bank, as trustee, under an agreement with defendant, of which he was the sole beneficiary.

made out a check for $553,000 payable to that company at Quinn's direction. The requisition for this check was signed by defendant with the notation in Ahern's handwriting "Reason for disbursement; prepayment of rent expense, see board of directors approval on March 28, 1963."

On April 3, 1963 President Geisen learned from Ahern of the so-called prepayment of rent. The next morning he contacted Director Douglass and Mr. Culbertson, attorney for Beverly. As a result an emergency meeting of the Beverly board was called for April 5. Contrary to the prevalent feeling expressed among the members, Quinn said he thought he had authority to act as he did and told the board he had discussed it with Geisen. However, Quinn did acknowledge that Geisen had advised against it. Quinn agreed to restore the funds taken by April 23, 1963, when the bank's regular meeting was due, but on that date had restored only $53,166.66, leaving unpaid $500,000. At that meeting the lease between Beverly and the La Salle National Bank trust was finally approved.

1. Seeking reversal of the judgment of the district court, defense counsel argues that the actions of Quinn were done openly and in "broad daylight", and, as a matter of law, the prepayment of rent did not, therefore, constitute an act committed with that intent requisite to make it a felony.

On the other hand, the government argues that the facts and circumstances surrounding the taking of the $553,166.66 were sufficient to establish that Quinn acted for himself and in utter disregard of Beverly.

As we understand the theory of defense counsel, it is embodied in this statement in his brief:

"The very openness with which Quinn acted belies any idea that he acted with the felonious intent required for conviction under the statute, and the existence of a written contract right to receive over a period of time the money which he did receive would add the only other element required to negative criminal intent entirely."

We reject this contention. The jury would have been justified in believing from the evidence that defendant was a man exceptionally well-versed in the financial operations in which he was engaged and that the method which he used in accomplishing the misapplication of funds of Beverly was willful and knowingly wrong. That he took them under the guise of a so-called prepayment of rent does not alter the fact that he misapplied the funds.

Defense counsel cites Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). The instant case is different from *Morissette* in which plaintiff, a fruitstand operator in summer and in winter a scrapiron collector, unsuccessfully hunted deer, but made the mistake of trying to meet his expenses of the trip by salvaging some spent bomb casings of air-force-dropped simulated bombs at ground targets in a government owned range located in good deer hunting country. Plaintiff, who testified at his trial, found the bomb casings which had been thrown into piles but not stacked or piled in any particular order and some of them had been exposed to the weather for over four years and were rusting away. He believed the casings were abandoned and had no intent to steal property. Morissette loaded some on his truck and had a farmer flatten them with a tractor. He sold the material thus obtained for $84. All that he did was in full view of passersby.

Indicted for stealing property of the United States, of a value of $84, the United States government prosecuted him and he was convicted and sentenced to *two months imprisonment or a fine of $200, as a result of which this case went through all the courts.* In a thorough opinion, the Supreme Court reversed.

A comparison of the strategic manipulations of defendant in the case at bar with the naivete of Morissette makes inapplicable here the holding of the court

in *Morissette*. We are convinced that no error was committed by the trial court in this respect.

■ 2. Defendant directs our attention to the language of 18 U.S.C. § 657:

> Whoever, being an officer * * * of * * * any * * * savings and loan * * * association * * * the accounts of which are insured by the Federal Savings and Loan Insurance Corporation * * * embezzles, abstracts, purloins or willfully misapplies any moneys, funds, credits, securities or other things of value belonging to such institution, * * * shall be fined * * * or imprisoned * * *.

His counsel contends that the term "misapplication" when used to denote a crime, lacks any definite meaning and became a crime only by statutory enactment. It is admitted that its definition was attempted in Johnson v. United States, 4 Cir., 95 F.2d 813 (1938), and that the case of United States v. Britton, 107 U.S. 655, 668, 2 S.Ct. 512, 27 L.Ed. 520 (1882), requires a combination of an intent to injure with an intent to defraud. Counsel expresses the opinion that this has resulted in holdings which appear to require a combination of intentional, deceitful and fraudulent action together with a specific financial transaction which causes loss to a protected institution and that neither injury alone nor deceit alone is enough to constitute the wrong, but that there must be proof of an injury resulting from the act. However, the district court here instructed the jury that the third element of the crime of misapplication is that the defendant did the act "knowingly, willfully and with the intent to injure or defraud the Association". Thereupon defense counsel objected because he thought that the word "or" should have been "and" and tendered an instruction accordingly. See United States v. Hickey, 7 Cir., 360 F.2d 127 (1966), where we discussed, at 144, the correctness of instructions under § 657, and at 145, speaking of the facts in that case, we said:

> "* * * The risk to the lender is obvious, and *the requisite intent to injure or defraud* may be inferred from knowledge of this fact and misrepresentation of it. The risk of injury is similarly apparent when an officer causes a loan to be made for his own benefit through misrepresentation. * * *"

3. Defense counsel at trial objected to the court's questioning of Beverly's director, Douglass. Douglass was called as a witness and testified about the April 5, 1963, emergency board meeting in the office of Mr. Culbertson, Beverly's attorney. The testimony of Mr. Douglass about this meeting which was elicited by the court during the redirect examination of Douglass was:

> "The principal thing I recall is Mr. Culbertson's statement that he would not have handled the redemption of the property on the farm, that involved, I think, something like $95,000.00, if he had known the funds had come from this advance payment of rent."

Counsel at trial moved for a mistrial or, in the alternative, to strike the testimony relating to what Culbertson said as being prejudicial. The court denied both motions.

In this court, defense counsel now contends that Douglass' answer was prejudicial hearsay. He urges that Culbertson did not testify and that there is no evidence that he was unavailable at the time of the trial; furthermore that Douglass was allowed to testify as to conversations which occurred at the meeting.

Defense counsel relies on Wigmore on Evidence, 3rd Edition (1940), § 1362, Volume 5, page 10. We think it is misplaced. However, in Wigmore on Evidence, 3rd Edition (1940), § 1766, Volume 6, pages 177–178, it is stated:

> "If, therefore, an extrajudicial utterance is offered, not as an assertion to evidence the matter asserted, but *without reference to the truth of the*

*matter asserted,* the Hearsay rule does not apply."

■ That this thought was involved in the court's ruling below is evidenced by what it said:

The Court: I think he is probably at this point beyond the scope in one sense of the direct or cross, but I think he is within the scope of what happened at this meeting. We are trying to find out, as I understand it, what happened at this April 5th meeting with respect to the prepayment of the rent, and it seems to me this is relevant to the issue of what the discussions were.

\* \* \*

The question is whether it is properly admissible or not. I take it that the conversation which preceded a motion, the discussion which preceded a motion adopted at a directors meeting, which you gentlemen had ventilated in both direct and cross, that there can hardly be anything very improper about the conversation which preceded that motion even if the question is asked by the judge. I must confess to you that I don't see how you have any grounds for a mistrial because in response to a question as to what the conversation was prior to a motion being adopted, *which you both had the witness discussing,* the witness says among other things that were said was if the attorney had known that the source of some of these funds was this advance payment of rent, he would not have handled a separate transaction in which some of the funds were used the way he did. (Emphasis supplied.)

However, were the statement conceded to be hearsay, we hold that the error is harmless in view of defense counsel's refusal to agree that the jury be instructed to disregard the testimony. Rule 52(a) Federal Rules of Criminal Procedure.

■ 4. The court gave the following instruction to the jury:

*If you find the assumption of truthfulness with respect to all witnesses*

who are sworn to be outweighed as to *any witness, then you will give the* testimony of that witness such credibility if any, as you may think it deserves.

Defendant's counsel alleges prejudicial error by the instruction "on the ground that an assumption that witnesses tell the truth is, of necessity, in derogation of the presumption of innocence".

It is important to note that defendant voluntarily testified as a witness in this case. When he did so he made his testimony subject to the same tests as to credibility as those applied generally to all witnesses. Therefore his interest in the outcome of the case became a matter relevant to the weight to be given by the jury to his testimony. The criticized instruction was applicable generally to witnesses in the case, including defendant. His credibility thereupon by his own act became a matter for jury consideration. This conclusion is not at variance with the holding in United States v. Johnson, 3 Cir., 371 F.2d 800 (1967), relied on by defense counsel, where the court said, at 804:

"\* \* \* It therefore was of the highest importance that the presumption of the innocence of the defendant —*who did not take the stand in his defense*—should be preserved. \* \* \*" (Italics supplied for emphasis.)

■ 5. Defendant charges error was committed by the district court when, in instructing the jury, it said:

"\* \* \* What does misapplication or misapply mean? As used in the statute and as used in this indictment, it means the unlawfully taking or conversion by a person to his own use of the moneys or funds of an insured savings and loan association."

His counsel argue in this court that the jury were thus left to decide whether or not the making of a prepayment of rent might or might not be unlawful.

However, this instruction was given to the jury following a proper instruction on the elements of the crime of

misapplication.[4] United States v. Hickey, 7 Cir., 360 F.2d 127, 144 (1966), cert. den. 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966). We find no error in this respect.

6. Defense counsel further contend that federal criminal law should not depend upon local state law for its applicability to a particular transaction. We doubt the seriousness of this contention in view of the charge in the indictment that defendant, with intent to defraud Beverly, unlawfully and willfully misapplied and caused to be misapplied monies, funds, and credits of Beverly in the amount of $553,166.66 by converting same to his own personal use by means of a check of Beverly for that amount.

Counsel for defendant has advanced no argument which convinces us that the present proceeding has deprived defendant of any rights under the fifth amendment to the constitution of the United States.

7. While defendant was testifying on redirect as to the reason that parts of the Beverly building were unfinished and unrented, the following colloquy ensued:

\* \* \* \* \* \*

The Witness: The north and south wings of the building were unfinished subject to client's requirements. If a doctor came in we would have to accommodate a doctor. If another business came in and wouldn't need the plumbing, we would have to accommodate them.

We would have to accommodate them for the amount of size of their requirements, maybe 800 feet or a couple thousand feet. We would have to provide air conditioning and heating for that space and the corridors and electrical service.

Mr. Collins: In other words, the tenants said what they wanted and that is what you had to put in?

The Witness: We would accommodate the tenants.

Mr. Collins: That's all.

The Court: Mr. Nash, do you have anything further?

Mr. Nash: When did Beverly Savings and Loan Association close, Mr. Quinn?

Mr. Collins: Objection, objection. May I be heard on that.

The Court: Sustained; completely outside the scope of redirect, certainly.

After discussion with his client, defendant's attorney made a motion for a mistrial with prejudice.

The question which the government counsel asked on recross-examination came after defendant had testified to the growth of Beverly from the time the witness became associated with it in 1958 from $1,000,000 in assets and deposits to $36,000,000 in February, 1963. This was over the objection of the government that the question was irrelevant. On redirect examination, defendant testified in answer to his attorneys' question that when he became president he directed the policies of the association until April of 1963, with the help of Geisen and the other directors in campaigning to get more savers, and that the assets at the end of March 1963 were $36,200,000. Immediately after this showing, the question objected to was asked. The court denied the motion for a mistrial and sustained an objection to the question. The jury was instructed as follows:

Let me say first that I sustained Mr. Collins' objection to the question, which was highly improper and should not have been asked. Whether or not Beverly Savings and Loan closed is immaterial to this case. We are not talking about Beverly Savings and

---

4. This clear and exhaustive instruction dealing with the facts in the case at bar and appearing in appellant's appendix, Vol. III, page 811, et seq., correctly informed the jurors in language easily understood by laymen of the meaning of the words "misapplication" and "misapplied" as pertinent to this case.

Loan's success or failure as an institution. We are talking about Mr. Quinn's alleged conduct with respect to this transaction, and whether or not that had any aspects of violation of the law. That is what you are going to have to decide.

Beverly Savings and Loan could be as solvent as the First National Bank of Chicago, or as insolvent as some institution I can't think of, some insolvent institution. It wouldn't make any difference in this case, which is whether this transaction constituted a violation of the law and that's all.

So you ignore the question and don't worry about Beverly's status, whatever that status may be.

Thereupon the defense rested and, after an adjournment and reconvening, the government rested its case.

■ Counsel for defendant, actuated undoubtedly by an intent to impress the jury with the successful management policies of Beverly, sought to convince the jury that it was due to defendant's direction and efforts that the assets of Beverly grew from $1,000,000 to $36,200,000. In common parlance an effort was made to "puff up" the stature of defendant in the eyes of the jury. Of course, this effort was permissible as a trial tactic, although it involved some risk and invited the natural question of "what became of Beverly?" The question of "How come Beverly closed?" was perhaps unintentionally invited, if not attracted, by the direct testimony of defendant elicited by his own counsel. In fact, government counsel was entrapped, although he should have been more careful. However, we have faith in the common sense of jurors, who are people of at least average intelligence and who are able to appraise the value of such an incident as we are now discussing and to give it only the weight to which it is reasonably entitled. We are convinced that the action of the district court in entering the judgment from which this appeal was taken is corroborative of our view on this point. We would not be justified in reversing the judgment below because of this ruling by the district court.

For all of these reasons, the judgment of conviction of defendant, from which this appeal was taken, is affirmed.

Judgment affirmed.