UNITED STATES of America,
Plaintiff–Appellee,

v.

Andrea HALL and Richard Magnant,
Defendants–Appellants.

Nos. 86–2203, 86–2275.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 9, 1987.

Decided Aug. 16, 1988.

Allan A. Ackerman, Allan A. Ackerman
P.C., Chicago, Ill., for defendants-appellants.

Mitchell A. Mars, Asst. U.S. Atty., Anton
Valukas, U.S. Atty., Organized Crime &
Racketeering Sec., Chicago, Ill., for plaintiff-appellee.

Before POSNER, EASTERBROOK
and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Andrea Hall and Richard Magnant were
convicted of conspiring to possess and dis-

tribute cocaine. They [1] appeal from their conviction alleging that: (1) the district court improperly instructed the jury on a definition of "reasonable doubt;" (2) the trial court committed prejudicial error by instructing the jury that trial witnesses are assumed to speak the truth; (3) the government engaged in intentional misconduct by obtaining an affidavit which was allegedly "filed *in camera;*" and (4) the trial court erred in disallowing the impeachment of a non-testifying co-conspirator.

We find that under the circumstances of this case, the instructions given by the court did not prejudice the defendants. Moreover, because we agree with the district court's ruling with respect to the suppression of certain impeachment evidence and the admissibility of the affidavit filed by defendant Hall, we affirm the defendants' convictions.

## A. *BACKGROUND*

Defendants Hall and Magnant, along with several other co-defendants, were indicted for participating in a conspiracy to distribute and sell cocaine. Hall and Magnant were ultimately convicted of possessing cocaine with the intent to distribute and distributing cocaine in violation of 21 U.S.C. § 846. The evidence at trial was that co-defendant Sam Sarcinelli headed a large drug distribution operation, obtaining cocaine in Florida and distributing it in California, Chicago, and New York. Co-defendant Larry Bradi, a former Chicago police officer, operated Sarcinelli's drug dis-

tribution business in Chicago. Hall was Bradi's girlfriend and an active participant in Bradi's organization. She made several telephone contacts and engaged in transactions involving cocaine. Specifically, Hall collected money and delivered the cocaine. In addition, Hall accompanied Bradi to Los Angeles to pick up cocaine from Sarcinelli. Hall also kept written records of the amounts of cocaine distributed to Bradi's dealers and the amounts of money received.

Magnant was also in Bradi's employ. It appears he was involved with the enforcement branch of the operation and in particular, with collecting a debt owed to Bradi by several of his sub-dealers. Magnant became a go-between between Bradi and his dealers. Magnant also accompanied another co-defendant to Los Angeles to obtain cocaine.

## B. *THE APPEAL*

On appeal, Hall and Magnant do not challenge the sufficiency of the evidence against them. Rather, they seek a reversal of their convictions on the basis of several of the court's jury instructions. In addition, Hall and Magnant also challenge several of the court's rulings.

### 1. *Reasonable Doubt Instruction*

First, both defendants challenge the district court's use of its reasonable doubt instruction.[2] Citing *United States v. Lawson,* 507 F.2d 433 (7th Cir.1974), *cert. denied,* 420 U.S. 1004 (1975), Hall and Mag-

---

**1.** Although defendants filed a joint brief on appeal, some of the arguments advanced on appeal pertain only to defendant Hall.

**2.** The reasonable doubt instruction given at trial was as follows:

The first proposition which I think you must remember, is that the law presumes a defendant to be innocent of a crime. This means that a defendant, although charged by an indictment ... begins a trial with a clean slate, with no evidence against that defendant. And the law permits nothing but legal evidence ... to be presented to you, and to be considered by you in support of any charge against the defendant. This means that the presumption of innocence alone may be sufficient to acquit a defendant, unless you are satisfied beyond a

reasonable doubt of the defendant's guilt from all the evidence in the case. *A reasonable doubt is a fair doubt based upon reason and common sense arising from the state of the evidence.* A reasonable doubt may arise not only from the evidence produced, but also from a lack of evidence. Since the burden is upon the prosecution to prove a defendant guilty beyond reasonable doubt of each essential element of the crime which has been charged, a defendant has the right to rely upon the failure of the prosecution to establish such proof. (emphasis added).

This language was taken by the district judge from Mathes, *Jury Instructions and Forms for Federal Criminal Cases,* Instruction No. 2.01, 27 F.R.D. 39 (1961).

nant argue that this court has said that "because of the problems of defining reasonable doubt," no instruction defining reasonable doubt should be given. Moreover, defendants state that in *United States v. Martin–Trigona*, 684 F.2d 485 (7th Cir. 1982) this court:

> ... admonished district courts not to define reasonable doubt. We advise against defining reasonable doubt because often the definition engenders more confusion than does the term itself. We trust that no instruction defining *reasonable doubt* will be given on remand.

684 F.2d at 493 (citations omitted).

Hall and Magnant say that the district court not only impermissibly instructed on reasonable doubt, but in doing so, also watered down the constitutional requirements of reasonable doubt. They argue that the court's instruction equated reasonable doubt to fair doubt, thereby diminishing the constitutional requirement that a defendant be convicted only if each element has been proved beyond a reasonable doubt. Hall and Magnant maintain that the court's impermissible instruction mandates a reversal of their convictions.

In response, the government concedes that this court has indeed admonished the district courts not to define reasonable doubt. However, the government argues that we have never reversed a conviction simply because the trial court attempted to define reasonable doubt. Although, a reasonable doubt definition at some point may become so incomprehensible that it is prejudicial, the government argues that this is not the case here. In support of its argument, the government cites to a number of cases wherein this court has ruled that although the reasonable doubt instruction given was objectionable, no reversal was warranted. The government argues the instruction given in this instance does not rise to the level of those objectionable reasonable doubt instructions and, therefore, that no reversal is required here.

We have had numerous occasions to consider the propriety of instructing on a definition of reasonable doubt. In *Lawson*,

*supra*, we held that the *refusal* to instruct on reasonable doubt even where an acceptable instruction has been offered, is not reversible error. In so ruling, this court reasoned that defining reasonable doubt is often more confusing than illuminating. 507 F.2d at 443. In *United States v. Marquardt*, 786 F.2d 771, 785 (7th Cir.1986), in which we affirmed our decision in *Lawson*, we held that a failure to define reasonable doubt is *not* prejudicial. However, our rulings in *Lawson* and *Marquardt* left open the question whether it is a reversible error to give a jury any definition of reasonable doubt, the very issue presented here.

Although we have decried the use of instructions which attempt to define reasonable doubt, *Martin–Trigona*, 684 F.2d at 493; *United States v. Allen*, 596 F.2d 227, 230 (7th Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 149, 62 L.Ed.2d 97 (1979), we have also held that defining reasonable doubt will constitute reversible error *only* where the instruction is misleading or confusing. *United States v. Regilio*, 669 F.2d 1169, 1178 (7th Cir.), *cert. denied*, 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982). Thus, although defining reasonable doubt has not constituted a *per se* reversible error, we have held that any confusion engendered by such a definition may indeed create error.

The instruction given in this case does equate "reasonable doubt" with "fair doubt" and defines a fair doubt as one "based on reason and common sense." Was that language confusing, thereby impermissibly diminishing the government's burden of proof? In *United States v. Wright*, 542 F.2d 975 (7th Cir.1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977); *United States v. Hollinger*, 553 F.2d 535 (7th Cir.1977), this court reviewed a number of similar instructions which equated a reasonable doubt to a substantial doubt. The *Wright* court first took note of two cases, including *United States v. Gratton*, 525 F.2d 1161 (7th Cir.1975), *stay denied*, 423 U.S. 1067, 96 S.Ct. 1090, 46 L.Ed.2d 658 (1976) in which the court held that in the absence of an objection to an instruction defining rea-

sonable doubt as a substantial doubt, no reversible error was committed, and *United States v. Crouch,* 528 F.2d 625 (7th Cir.), *cert. denied,* 429 U.S. 900, 97 S.Ct. 266, 50 L.Ed.2d 184 (1976), in which the court said that had the instructing judge been aware of the *Gratton* decision, the instruction given, equating reasonable doubt with substantial doubt, would have constituted reversible error. After reviewing *Gratton* and *Crouch,* the *Wright* court then issued the following admonition, "a district court giving a reasonable doubt instruction containing the challenged equation [reasonable doubt = substantial doubt] ... can reasonably expect a reversal." 542 F.2d at 988.

■ The issue we must decide in this case is whether equating a reasonable doubt to a fair doubt is akin to equating a reasonable doubt to a substantial doubt. It is not. Fair doubt, in the context of this instruction, is neutral indicating an application of fairness. However, substantial doubt is quantitative and is in derogation of reasonable doubt. The phrase "fair doubt" is unhelpful, but it does not impinge upon the reasonable doubt standard.

Other factors also influenced our decisions in cases in which a definition of reasonable doubt was attempted. Despite dubious language, equating reasonable doubt to some other measure of doubt, the instructions did not constitute a constitutional infringement where the instructions also contained language that a defendant is presumed innocent; that the burden of proof never shifts from the government; that the defendant is not obligated to come forward with any evidence; and that a failure to prove guilt beyond a reasonable doubt must result in an acquittal. *United States v. Crouch, supra, United States v. Shaffner,* 524 F.2d 1021 (7th Cir.1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed. 2d 327 (1976).

■ In this case, the instruction given to the jury stated that a defendant is entitled to a presumption of innocence which, if the government fails to meet its proof, is sufficient to acquit the defendant. Additionally, the instruction also stated that the burden of proving the defendant's guilt beyond a reasonable doubt, as to each essential element of the crime, was on the government. The instruction stated further that the defendant may rely on the government's failure to meet its burden, implying the defendant was not obligated to come forward with any evidence of his own. We believe that in light of the language of the entire instruction, equating reasonable doubt to fair doubt did not constitute reversible error in this case.

■ The tortured attempts to define reasonable doubt have yet to produce anything which has been approved by this court. Moreover, we have recently indicated that no attempt should be made to define reasonable doubt. *United States v. Glass,* 846 F.2d 386, 387 (7th Cir.1988).[3] The reason for the prohibition is not that all attempted definitions of reasonable doubt infringe upon the constitutional rights of a defendant. Some, as we have found here, do not. However, the point is that, at best, definitions of reasonable doubt are unhelpful to a jury, and, at worst, they have the potential to impair a defendant's constitutional right to have the government prove each element beyond a reasonable doubt. An attempt to define reasonable doubt presents a risk without any real benefit.

## 2. *Presumption of Truthfulness Instruction*

Defendants next argue that the trial court committed error when, over objection, it instructed the jury that trial witnesses are assumed to speak the truth.[4]

---

3. To use the language in *Glass,* 846 F.2d at 387, "[T]his circuit's criminal jury instructions forbid [defining reasonable doubt]. *See* Federal Criminal [Jury] Instructions of the Seventh Circuit 2.07 (1980)." *But see* Federal Judicial Center, Pattern Criminal Jury Instructions 21 (1987) (definition of reasonable doubt).

4. The jury instruction to which the defendants refer stated:
   With respect to the testimony of witnesses ... in weighing the testimony of witnesses and this is your special responsibility, *we start out assuming that the witness will speak the truth.* The witness is sworn, raises his or her right

Defendants rely on the case *United States v. Varner*, 748 F.2d 925 (4th Cir.1984) in which the Fourth Circuit Court of Appeals ruled that "an instruction that a witness is presumed or assumed to tell the truth is improper."

Magnant, in particular, objects to this instruction. Hall testified on her own behalf but Magnant chose to forego an opportunity to take the stand. Magnant argues that this instruction was especially prejudicial to him since it implies that because he did not take the stand, it cannot be assumed that he was truthful.

The government again acknowledges that this court has disapproved of general witness credibility instructions, but argues that we have never reversed a conviction because of such an instruction. The government points out that even in circuits in which a presumption of truthfulness instruction has led to a reversal, the courts look to the complete jury charge before reversing. Only if the entire jury charge is tainted by the truthfulness instruction will a conviction be reversed.

In 1967 and 1969, in cases in which the same district judge who presided in this case, also presided,[5] we cast doubt on the value of an instruction which advises the jury of a presumption or assumption that a witness speaks the truth. However, contrary to other circuits, it does not appear that we specifically and unequivocally advised district judges to discontinue any reference to a presumption or assumption of a witness' truthfulness. *See United States v. Hyman*, 741 F.2d 906, 909–10 (7th Cir. 1984); *United States v. Quinn*, 398 F.2d 298 (7th Cir.), *cert. denied*, 393 U.S. 983, 89 S.Ct. 451, 21 L.Ed.2d 444 (1968).

In *United States v. Isaacs*, 493 F.2d 1124, 1163 (7th Cir.1974), we ruled that an instruction which states that a witness is "sworn" to tell the truth does not create the same constitutional concerns as one that instructs that a witness is "assumed" or "presumed" to tell the truth. In this case, the court instructed the jury the "we start out assuming that the witness will speak the truth." While the instruction contains the language which has been specifically disapproved, we have never reversed a conviction on the basis of such an instruction. *Hyman*, 741 at 909 n. 4 (7th Cir.1984), and we will not do so in this case.

We indeed have found it "a better practice to refrain from giving [a presumption of truthfulness] instruction." *United States v. Roviaro*, 379 F.2d 911, 915 (7th Cir.1967). Later the same year, we said, "It would be better not to use this language." *United States v. Dichiarinte*, 385 F.2d 333, 339 (7th Cir.1967), *cert. denied sub nom.*, *Mastro v. United States*, 390 U.S. 945, 88 S.Ct. 1029, 19 L.Ed.2d 1133 (1968). Although the "helpfulness" of the presumption of truth instruction has been debated, it has been held not to be unfair to the defendant. *United States v. Knaack*, 409 F.2d 418 (7th Cir.1969), *cert. denied*, 396 U.S. 831, 90 S.Ct. 87, 24 L.Ed.2d 83 (1969). Finally, we have also found such an instruction to be no error at all when the defendant who challenged it took the witness stand. *Quinn*, 398 F.2d at 303.

In fact, the presumption is correct —a witness is presumed to tell the truth once he is sworn. However, it is the focus on this presumption in a *criminal* case

---

hand, puts her left hand on the Bible, and takes an oath to the best of his or her ability he or she will speak the truth.
That assumption may be outweighed by the manner in which the witness testifies, by the character of the testimony given or by more persuasive contradictory evidence ... (emphasis added).
This language in the court's instruction was based on Mathes, *Jury Instructions and Forms for Federal Cases*, Instruction 3.01, 27 F.R.D. 39 (1961). The word "presumed" in the pattern instruction was altered to "assuming" when the instruction was given.

5. *United States v. Roviaro*, 379 F.2d 911 (7th Cir.1967) and *United States v. Knaack*, 409 F.2d 418 (7th Cir.), *cert. denied*, 396 U.S. 831, 90 S.Ct. 87, 24 L.Ed.2d 83 (1969). One source of the problem concerning attempts to define reasonable doubt and to assign a presumption of truthfulness to witnesses, originated in outdated pattern jury instructions. In this case, the culprit was the 1961 Mathes, *Jury Instructions and Forms for Federal Criminal Cases*, 27 F.R.D. 39 (1961).

which has been thought to "water down" the more important presumption of innocence of a non-testifying defendant. The safest course is, therefore, to refrain from the possibility of a negative inference regarding a criminal defendant's decision not to testify. The danger of such a negative inference may be slight, but it is there.

Thus, in evaluating the impact of the instruction in this case, we must look at the totality of the circumstances. In the context of the instructions as a whole, we find that the single phrase on the general assumption of a witness' truthfulness did not conflict with defendants' presumption of innocence or with the government's burden of proof, and did not invade the jury's ability to judge the witnesses' credibility. See Cupp v. Naughten, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).[6]

### 3. "In Camera" Affidavit

Hall next argues that the government impermissibly obtained an affidavit that she allegedly had submitted to the district judge for an *in camera* review. Because the government was able to obtain this affidavit, which contained certain matters that she would not have revealed to the government, Hall contends the government was able to cross-examine her more effectively at trial.

Shortly before the trial commenced, defendant Hall filed a motion for severance. In support of her motion for severance, Hall submitted a multi-page affidavit, labeled *"in camera,"* in which she argued that her co-defendant Larry Bradi was hostile and antagonistic toward her. Hall did not, however, request an *in camera* review of the affidavit. Moreover, she bypassed normal filing procedures by simply labeling the affidavit *"in camera"* and mailing it to the judge's chambers. Reference to the purported *in camera* submission was set forth in her written motion, and she notified the government by letter that an affidavit had been submitted. The judge, upon receipt of the affidavit, had his clerk file it as a part of the court record. As a result, the government, in responding to Hall's severance motion and in searching through the court record, discovered Hall's affidavit.

Hall now argues that it was incumbent upon the government to alert the trial court and/or defense counsel that it was in possession of the affidavit. In addition, regardless of the fact that the affidavit was found in the court record, Hall argues that the government should not have used the affidavit to cross-examine her. Defense counsel expressed some dismay that, at the time of the trial, the judge neither realized that the affidavit had been "submitted *in camera*," nor knew that the affidavit had been filed in support of the motion for severance. Apparently, the court denied Hall's motion for severance without a hearing before trial. Hall now argues that her conviction must be reversed since the acquisition of the affidavit violated her sixth amendment right to effective assistance of counsel. Hall also argues that the government's failure to disclose the fact that they had obtained her affidavit violated Fed.R.Crim.P. 16.

■ The government contends that Hall's position with regard to the affidavit is untenable. When the government sought to introduce the affidavit at trial to impeach Hall, defense counsel objected to its use. The prosecution explained that it had obtained the affidavit from the public record. The court, at that time, indicated that it did not recall receiving the affidavit under seal and that in any event it would not have accepted such an affidavit for *in camera* review since there was no reason for submission of such a secret document. Ultimately, the court barred the government from using the affidavit to impeach Hall. The government argues that Hall's contention that the affidavit was impermissibly obtained and used is, therefore, moot.

---

**6.** In *Cupp v. Naughten,* the Supreme Court held that the presumption of truthfulness instruction did not invalidate a conviction where the court also instructed on the presumption of innocence and duty to find guilt beyond a reasonable doubt, as the district court did here. The Court also discussed the Mathes pattern instruction as the source of the difficulty. *Id.* 94 S.Ct. at 399.

We agree. When the government attempted to use the affidavit to impeach Hall, defense counsel objected. The court sustained the objection and disallowed its use. No other objections were made. Thus, having won her only objection to the use of the affidavit at trial, defendant Hall did not preserve any other issue for appeal.

As an additional matter, Hall's affidavit contained no new evidence of which the government was not already aware. Hall provided the government with the information contained in the affidavit in her previous motion for a bill of particulars. In that motion, Hall indicated that her defenses would include involuntary drug addiction, threatened harm, and a withdrawal from the conspiracy. Nothing in the affidavit could therefore be described as new evidence.

■ Hall's designation of an affidavit as "*in camera*" did not render that affidavit judicially sealed or trigger an *in camera* review by the district judge. An *in camera* review requires much more. The properly limited use of *in camera* review typically occurs during the course of litigation and requires adversarial safeguards. Initially, a party seeking an *in camera* review of any material must give appropriate notice of such a request to the opposing party as well as the court. Once the purpose for the *in camera* review is explained, the opposing party has an opportunity to respond, and the court may then either accept or reject the review proposal. If the court agrees to an *in camera* review, the moving party submits the material to the judge with such submission noted on the docket. The judge makes his *in camera* review. Then, depending on the judge's findings and the terms of submission outlined by him, the material may be ordered sealed. Whether sealed or unsealed, the material is preserved as a part of the court record. Of course, variations of this method may be provided by the district judge.

In light of the inappropriate procedure used by Hall in submitting an essentially *ex parte* communication to the court, it is not surprising that the affidavit ended up a matter of public record in the clerk's office —thus, making it available for government examination.

### 4. *Ability to Impeach Witness*

■ As a final matter, Hall argues that the trial court impermissibly restricted her ability to impeach the credibility of a non-testifying co-conspirator. At trial, a Chicago police officer testified that he had several conversations with codefendant Caskey. These conversations were secretly taped. During one of the conversations, Caskey told the police officer that Larry Bradi and Hall had transported cocaine from Los Angeles to Chicago. Hall attempted to attack Caskey's credibility by asking the testifying police officer whether he believed Caskey. The judge would not permit this line of questioning. On appeal, Hall contends that the court's refusal to permit her to cross-examine the police officer was equivalent to a refusal to permit impeachment testimony on Caskey's prior convictions.

The district court correctly declined to permit the cross-examination regarding the officer's opinion of Caskey. Hall did not attempt to use Caskey's prior convictions for impeachment purposes. The record shows that Hall never indicated that she wished to attack the credibility of Caskey (the non-testifying co-conspirator) with evidence of Caskey's prior convictions. The record shows only that Hall's counsel wanted to question the testifying police officer about whether he believed Caskey, clearly an impermissible means of impeachment. *Schultz v. Thomas*, 832 F.2d 108, 110 (7th Cir.1987). Moreover, although the court invited counsel to make a proffer of the impeachment evidence outside of the jury's presence, counsel did not take advantage of that opportunity. Thus, Hall waived any argument that evidence of Caskey's prior convictions should have been admitted. We find the district court correctly declined to admit the proffered evidence.

We note that even if Hall had proffered evidence of the co-conspirator's prior convictions, there is some question whether that evidence would have been admissible. In *United States v. Robinson*, 783 F.2d 64 (7th Cir.1986), this court recognized that

problems arise when the co-conspirator/declarant, whose credibility is subject to attack by evidence of prior crimes, is also a co-defendant. Where one defendant attempts to attack the credibility of another by introducing evidence of the co-defendant's prior convictions, there is a danger that the co-defendant's defense will be prejudiced since the presumption of innocence accorded the co-defendant may become tainted. Fed.R.Evid. 404(b); *Robinson,* 783 F.2d at 67.

As in *Robinson,* the statements of the non-testifying co-conspirator in this case were also the statements of a co-defendant. Thus, had Hall proffered evidence of the declarant's prior convictions, there is some doubt whether those convictions would have been admissible.

In conclusion, we find no reversible error occurred and the convictions of appellants Hall and Magnant are AFFIRMED.

POSNER, Circuit Judge, concurring.

I join the majority opinion but write separately to comment on a statement in it that may puzzle some readers: "An attempt to define reasonable doubt presents a risk without any real benefit."

This court has long "advise[d] against defining 'reasonable doubt' because often the definition engenders more confusion than does the term itself." *United States v. Martin–Trigona,* 684 F.2d 485, 493 (7th Cir.1982); see also Federal Criminal Jury Instructions of the Seventh Circuit 18 (1980) (instruction 2.07); *Murphy v. Holland,* 776 F.2d 470, 475 (3d Cir.1985), vacated on other grounds, 475 U.S. 1138 (1986) (per curiam). At times the court has seemed to go beyond advice, to something close to command (perhaps inadvisedly, for reasons suggested in *United States v. Sblendorio,* 830 F.2d 1382, 1388 (7th Cir. 1987), commenting on our attempt in *United States v. Silvern,* 484 F.2d 879 (7th Cir.1973), to establish a uniform instruction on another issue). *United States v. Glass,* 846 F.2d 386, 387 (7th Cir.1988), said that it is "inappropriate for judges to give an instruction defining 'reasonable doubt.'" The court relied in part on the statement in

*Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954), that "attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer in the minds of the jury"; but that is different from saying the judge should *never* make the attempt; far from saying any such thing, the Court in *Holland,* commenting on the instruction the judge had given, remarked that "this section of the charge should have been in terms of the kind of doubt that would make a person hesitate to act, rather than the kind on which he would be willing to act." *Id.* at 140, 75 S.Ct. at 138 (citation omitted). *Glass* also relied on instruction 2.07 of our pattern instructions, but said that the instruction "forbids" attempts to explain reasonable doubt to the jury; the actual word in the instruction, however, is not "forbids" but "recommends." Finally, *Glass* cited *United States v. Dominguez,* 835 F.2d 694, 701 (7th Cir.1987), which contains a dictum similar to that in *Glass* and supports it by reference to the pattern instruction (again substituting "forbids" for "recommends") and by citation to *United States v. Kramer,* 711 F.2d 789, 794–95 (7th Cir.1983), which cautioned against such instructions but did not forbid them.

The question whether the prosecution has proved the defendant guilty beyond a reasonable doubt is central to every criminal trial. Can it be that the term should *never* be defined? Is it a mystical term, a talisman, somehow tarnished by attempts at definition? Is a refusal to define key terms consistent with the search for truth? Recently a committee of the Federal Judicial Center that included our chief judge recommended the following instruction on reasonable doubt:

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged,

you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

Federal Judicial Center, Pattern Criminal Jury Instructions 28 (1987) (Instruction 21). This is surely harmless, and if perhaps no more than slightly helpful, still a district judge who on the basis of his experience with juries and his observation of the particular jury thinks that such an instruction would help the jurors in their deliberations should be allowed to give it, especially if the jury requests further instruction on reasonable doubt. Cf. *United States v. Littlefield*, 840 F.2d 143, 146–47 (1st Cir. 1988).

But ordinarily the district judge will be well advised to attempt no definition of reasonable doubt. (The contrary position is strongly argued in Judge Torruella's concurring opinion in *Littlefield*. See *id.* at 151–52.) This advice reflects experience (almost uniformly negative) with attempts to define the term rather than a dogmatic insistence on its resistance to definition or its self-evident quality. The verbal elaborations that have been tried appear to add little if any substance to the meaning conveyed by the term itself; deeply entrenched in the popular culture as it is, the term "beyond a reasonable doubt" may be the single legal term that jurors understand best. Definitions that translate the term into a probabilistic measure, while they may add content, are apt to mislead the jurors.

Undefined and unelaborated, the expression "proof beyond a reasonable doubt" requires, and is (I believe) understood to require, that the jury be certain of the defendants' guilt, with this proviso: complete certainty—the certainty of such propositions as that cats do not grow on trees and that I have never set foot on Mars—is never attainable with respect to the question whether a criminal defendant is guilty of the crime for which he is being tried, and the jury should set aside doubts that it would be unreasonable to entertain given the practical limitations on attaining certainty in the trial setting. When, however, judges and juries are asked to translate the requisite confidence into percentage terms or betting odds, they sometimes come up with ridiculously low figures—in one survey, as low as 76 percent, see *United States v. Fatico*, 458 F.Supp. 388, 410 (E.D. N.Y.1978); in another, as low as 50 percent, see McCauliff, *Burdens of Proof: Degrees of Belief, Quanta of Evidence, or Constitutional Guarantees?*, 35 Vand.L. Rev. 1293, 1325 (1982) (tab. 2). The higher of these two figures implies that, in the absence of screening by the prosecutor's office, of every 100 defendants who were convicted 24 (on average) might well be innocent. The assumption of no screening is important. See *Branion v. Gramly*, 855 F.2d 1256, 1263 n. 5 (7th Cir.1988). If the prosecutor screened so meticulously that no innocent person was ever prosecuted, then no innocent persons would be convicted no matter how low the standard of proof. The principal significance of the requirement of proving guilt beyond a reasonable doubt comes in cases where, because the screening has been careless or the prosecutor is improperly motivated, an innocent person has been indicted (the grand jury is no real screen). Unfortunately there are such cases—and we don't want a quarter of them to end in conviction.

Numerical estimates of probability are helpful in investments, gambling, scientific research, and many other activities but are not likely to be helpful in the setting of jury deliberations. No objective probability of a defendant's guilt can be estimated other than in the rare case that turns entirely on evidence whose accuracy can be rigorously expressed in statistical terms (e.g., fingerprints and paternity tests). In other cases the jury's subjective estimate would float free of check and context. It is one thing to tell jurors to set aside unreasonable doubts, another to tell them to determine whether the probability that the defendant is guilty is more than 75, or 95, or 99 percent.

If judges are not going to tell juries to attach a percentage figure to proof beyond a reasonable doubt, and if attempts at ver-

bal elaboration of reasonable doubt are likely to yield barren tautologies, it makes practical sense not to instruct the jury at all on the meaning of proof beyond a reasonable doubt. I therefore agree with Judge Kanne's admonition to the district judges.