STATE of North Dakota, Plaintiff
and Appellee,

v.

Ronald Scott THOMPSON, Defendant
and Appellant.

Cr. No. 920319.

Supreme Court of North Dakota.

Aug. 10, 1993.

Richard James Riha (argued), Asst. State's Atty., Bismarck, for plaintiff and appellee.

Michael Ray Hoffman (argued), Bismarck, for defendant and appellant.

LEVINE, Justice.

Ronald Scott Thompson appeals from a criminal judgment entered upon a jury verdict finding him guilty of one count of burglary, in violation of NDCC § 12.1–22–

02, and two counts of criminal trespass, in violation of NDCC § 12.1–22–03. We reverse and remand for a new trial.

The charges against Thompson were tried to a jury. The evidence adduced by the State consisted chiefly of eyewitness identifications of Thompson and items of clothing, seized from Thompson's residence, that allegedly matched those worn by the perpetrator of all three crimes. Beth Splonskowski, then age ten, testified that she saw an intruder in the kitchen of her parents' home at approximately 8:00 a.m. on December 17, 1991. The intruder looked at her momentarily and fled. Beth said that the man's face was covered by a black cap with a big eye-hole and no openings for the nose and mouth, and that he wore a green coat. Beth's mother testified that Beth told her the man was about as tall as her father, who is between five feet, eleven inches and six feet tall. Before trial, Beth was "pretty sure" that the black cap seized from Thompson was the one worn by the intruder. At trial, Beth was absolutely certain that that cap had been worn by the trespasser.

Jeannie Nelson testified that she was awakened at approximately 5:00 a.m., on December 18, 1991, by the sound of cupboards and drawers being opened and closed in the kitchen of her home. Believing the cause of the disturbance to be her husband, David Nelson, or her son, she went back to sleep. She arose 45 minutes later, finding her kitchen in disarray. The cupboard doors were open and mail and contents of her purse were strewn about the floor. David Nelson later found opened mail on the back steps of the home and further discovered that his leather jacket was missing. The jacket was never recovered.

Peggy Nagel testified that she was awakened at approximately 5:30 a.m. on December 18, 1991, by the slam of the back door of her boyfriend, Ted Morris', house. She had been asleep on the living room couch and, hearing footsteps in the kitchen, arose to see who had entered the home. She said she made eye contact with the man and was able to see his face because

the kitchen light was on. Upon seeing her, the intruder ducked back into the kitchen and ran out of the home. Morris and Nagel did not report the incident to the police. But, David Nelson did, after he overheard a conversation about the Morris break-in while getting a haircut at the salon where Nagel worked. Nelson recognized Ted Morris as being his neighbor and notified the police of what he had overheard.

The police eventually interviewed Nagel and Morris. Nagel described the intruder as a brown-haired, "stocky" man who stood between five feet, nine inches and five feet, ten inches tall. She also said that the man was wearing a gray coat and, possibly, blue jeans. Nagel also identified Thompson in photographic lineups conducted before and during trial. Although she could not positively identify the gray jacket at the police station, she did positively identify it at trial.

The State's final eyewitness was Chris Lembke, a newspaper carrier whose delivery route encompasses the neighborhood in which the Nelsons and Ted Morris live. Lembke testified that, at approximately 5:00 a.m., on December 18, 1991, he saw a man sitting on the porch of the home next to the Nelsons' home, rummaging through a leather jacket. Lembke delivered the Nelsons' newspaper and, minutes later, observed the same man walking in a nearby driveway, carrying the leather jacket. A short while later, Lembke again passed by the man, this time at a point a few blocks away from the Nelsons'. According to Lembke, the man was wearing a gray jacket and what appeared to be dark "joggers pants." He further explained that the man's face was covered by a dark cap with a jagged slit cut into it at eye level. Lembke, who stands over six feet tall, also said the man was between five feet, nine inches and five feet, eleven inches tall, and "stocky." The State's exhibits, which consisted of a dark cap with a homemade eye-hole, a gray jacket, and "joggers pants," and which had been seized from Thompson's residence, were all positively identified by Lembke as having been worn by

the man he had seen on the morning of December 18, 1991.

Thompson's defense was directed primarily to attacks upon the credibility of the eyewitnesses' identifications. He also attacked the failure of the police to attempt to gather fingerprints or other evidence and to conduct neighborhood checks. Thompson, however, did not testify.

After the parties rested, they met with the court in chambers to discuss the court's proposed final jury instructions. Thompson's attorney objected to the highlighted portion of the following proposed instructions on weight and credibility:

"You are the judges of all questions of fact in this case. You alone must weigh the evidence under these instructions and determine the credibility (believability) of those who have testified. As to these matters the Court expresses no opinion.

"In performing this task you may consider those facts and circumstances in the case which tend to strengthen, weaken, or contradict one's testimony. You may consider the age, intelligence, and experience of the witness, the strength or weakness of his recollection, how he came to know the facts to which he testified, his possible interest in the outcome of the trial, any bias or prejudice he may have, his manner and appearance, whether he was frank or evasive while testifying, and whether his testimony is reasonable or unreasonable.

"If you find a conflict in the evidence, you should reconcile it, if you can, because *each witness is presumed to have told the truth.* If you cannot do so, you have the right to determine whom of the witnesses you will believe, in whole or in part.

"You should give to all credible testimony its just and fair weight. You should consider the evidence in this case in the light of your common sense and your ordinary experience and observation of human affairs."

The objection precipitated the following colloquy:

"MR. HOFFMAN: I would object to that language. I think that is in error and I think the standard North Dakota Pattern Jury Instructions on Weight and Credibility was changed in part because of that language.

"THE COURT: In error? Is there case law to support that?

"MR. HOFFMAN: I don't have any case law, but I think—well, I guess I have some insight on that because I was for a time on the Pattern Jury Instruction Commission and I know that it was agreed upon by the Commission that that language was inappropriate to a criminal prosecution where the State has the burden of proof beyond a reasonable doubt, and I think it was agreed upon that to state that each witness is presumed to have told the truth is not appropriate, and if you look at the [new] Pattern Jury Instruction, that language is not in there for Weight and Credibility.

"THE COURT: Mr. Riha?

"MR. RIHA: As far as I know, as it is, it's a correct statement of the law, but I guess I'm not aware of any change in the instruction.

"THE COURT: Well, to state the obvious, the patterns are not binding, certainly. They are suggested and strongly recommended and heavily used by the trial bench and bar.... I think that [the disputed language] is a correct statement of law."

The disputed language, therefore, was included in the trial court's jury instructions on weight and credibility. The court also instructed the jury on the State's burden of proof, including a detailed charge on the concept of reasonable doubt, and on the presumption of innocence. The jury returned a verdict finding Thompson guilty on all three counts. Final judgment was entered and Thompson subsequently was sentenced to a ten-year prison term in the North Dakota State Penitentiary. Thompson appealed.

On appeal, Thompson urges us to find, as a matter of state constitutional law, that the presumption of truthfulness instruction contravened his due process protection

against conviction except upon proof beyond a reasonable doubt, and thus denied him a constitutionally fair trial. *See State v. Vogel*, 467 N.W.2d 86 (N.D.1991); N.D. Const. Art. I, § 12. We need not reach the constitutional issue raised by Thompson, however, because there are alternative grounds to resolve this issue. *See, e.g., Schaff v. Schaff*, 446 N.W.2d 28 (N.D. 1989); *Minot Daily News v. Holum*, 380 N.W.2d 347 (N.D.1986).

▆ Jury instructions must correctly and adequately inform the jury of the applicable law and must not mislead or confuse the jury. *E.g., State v. McIntyre*, 488 N.W.2d 612 (N.D.1992). In determining whether a jury instruction is misleading, the instruction must be considered as a whole, and if, when so considered, the instruction correctly advises the jury as to the law, it is sufficient even if part of it standing alone may be insufficient. *Id.* If a jury instruction, when read as a whole, is erroneous, relates to a central subject of the case, and affects the substantial rights of the accused, it is ground for reversal.[1] *Id.; see also* NDRCrimP 52(a) (error in criminal trial is harmless, unless error prejudiced defendant's substantial rights).

▆ Although the presumption of truthfulness instruction is permissible in a civil case, *see Andrews v. O'Hearn*, 387 N.W.2d 716 (N.D.1986) (in civil case, instruction not erroneous in context of entire instruction on weight and credibility), generally, in a criminal case, it is erroneous and should not be given, whether or not the defendant testifies. *See, e.g., Cupp v. Naughten*, 414 U.S. 141, 144 n. 4, 145–46 nn. 6–9, 94 S.Ct. 396, 399 n. 4, 399–400 nn. 6–9, 38 L.Ed.2d 368 (1973) (collecting cases); *United States*

*v. Varner*, 748 F.2d 925, 927 n. 2 (4th Cir.1984) (collecting cases); *Nelson v. State*, 595 So.2d 513 (Ala.Crim.App.1992); *State v. Percy*, 156 Vt. 468, 595 A.2d 248 (1990); *Stanley v. State*, 762 P.2d 946 (Okla.Crim.App.1988); *Laster v. State*, 70 Md.App. 592, 521 A.2d 1289 (1987); *Galauska v. State*, 532 P.2d 1017 (Alaska 1975). *But see Adams v. State*, 542 N.E.2d 1362 (Ind.App.1989); *United States v. Hall*, 854 F.2d 1036 (7th Cir.1988) (instruction not erroneous when defendant testifies). In *Cupp, supra*, the Supreme Court aptly summarized the various bases of the federal courts' all but universal condemnation of the instruction, echoed in the main by the state courts:

> "The criticism of the instruction by the federal courts has been based on the idea that the instruction may 'dilute,' 'conflict with,' 'seem to collide with,' or 'impinge upon' a criminal defendant's presumption of innocence; 'clash with' or 'shift' the prosecution's burden of proof; or 'interfere' with or 'invade' the province of the jury to determine credibility."

*Cupp*, 414 U.S. at 145, 94 S.Ct. at 399 (footnotes omitted). The instruction has also been criticized as "confusing and useless." *E.g., United States v. Rubio–Villareal*, 967 F.2d 294, 297 (9th Cir.1992) (citation omitted). *Cupp, supra*. The Seventh Circuit Court of Appeals recently explained that, in a criminal case, the presumption of truthfulness instruction "'water[s] down' the more important presumption of innocence of a non-testifying defendant ... [and creates] a negative inference regarding a criminal defendant's decision not to testify." *Hall*, 854 F.2d at 1041.

---

1. In *State v. Jensen*, 251 N.W.2d 182 (N.D.1977), we held that an instruction was ground for reversal if it "'was erroneous and related to a subject which was central to the case, and *therefore* affected the substantial rights of the defendant. *State v. Maresch*, 75 N.D. 229, 27 N.W.2d 1 (1947).'" (Emphasis added.) Beginning with *State v. Pfister*, 264 N.W.2d 694 (N.D.1978), the word "therefore" was omitted so that the two requirements for finding harmful error, sub silentio, were transformed into three: (1) error; (2) related to subject central to case; *and* (3)

affects defendant's substantial rights. That transformation has been perpetuated. *E.g., State v. Reich*, 298 N.W.2d 468 (N.D.1980); *State v. Bonner*, 361 N.W.2d 605 (N.D.1985); *State v. Haugen*, 458 N.W.2d 288 (N.D.1990); *State v. McIntyre*, 488 N.W.2d 612 (N.D.1992). While it is difficult for us to imagine when an error which relates to a central subject of a case would not affect a defendant's substantial rights, we feel constrained by precedent to continue to analyze harmless error using the three-criteria standard rather than the two-criteria standard set forth in *Jensen, supra*.

■ The jury is solely responsible for judging the credibility of the witnesses and determining the weight to be given their testimony. *E.g., State v. Morstad,* 493 N.W.2d 645 (N.D.1992). Those important functions " 'should not be encumbered by an assumption that witnesses speak the truth.' " *Varner,* 748 F.2d at 927 (quoting *United States v. Safley,* 408 F.2d 603, 605 (4th Cir.1969)). In effect, the presumption of truthfulness instruction "constitutes a comment [by the court] on the weight and credibility of the evidence, which is impermissible." *Nelson,* 595 So.2d at 512. "To employ [the instruction] in the face of an express objection is to invite reversal." *United States v. Gutierrez–Espinosa,* 516 F.2d 249, 250 (9th Cir.1975).

■ We join the multitude of disapproving voices that have preceded ours and conclude that an instruction that witnesses are assumed or presumed to speak the truth is erroneous, and "should *never* be issued in a criminal trial...." *Stanley,* 762 P.2d at 949 (emphasis in original). The question on appeal, however, is whether, under the facts and circumstances of this case, the erroneous instruction was harmless error or not. Many courts have held that giving the instruction, though improper, is harmless when the circumstances reveal that the erroneous instruction was cured by other instructions. *E.g., Hall, supra; Sosa v. State,* 591 So.2d 897 (Ala. Crim.App.1991); *Galauska v. State, supra; People v. Sosa,* 26 Cal.App.3d 514, 103 Cal. Rptr. 58 (1972). Others have held that, absent an objection, giving the instruction does not constitute reversible or plain error. *E.g., United States v. Ramos Algarin,* 584 F.2d 562 (1st Cir.1978); *United States v. LaRiche,* 549 F.2d 1088 (6th Cir. 1977); *United States v. Chrisco,* 493 F.2d 232 (8th Cir.1974); *Laster v. State, supra.* Because Thompson objected, there is no question of obvious error. Resolution of the remaining question of harmless error depends upon whether the instruction related to a central subject of the case and, if so, prejudiced Thompson's substantial rights. *McIntyre, supra;* NDRCrimP 52(a).

■ Obviously, a central subject in any criminal case is the accused's guilt or innocence. *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). That determination hinges upon the State's overcoming the presumption of the defendant's innocence by proving, to the satisfaction of the trier of fact, each element of the crime or crimes with which the defendant is charged beyond a reasonable doubt. *Vogel, supra.* As noted above, the presumption of truthfulness instruction may affect the presumption of innocence and the State's burden of proof, and certainly infringes upon the jury's exclusive functions of judging weight and credibility. Accordingly, we conclude that the instruction "relates" to a central subject of this case— Thompson's guilt or innocence.

■ We also conclude that, under the circumstances of this case, the erroneous instruction prejudiced Thompson's right to have the jury determine issues of weight and credibility without prompting or influencing by the court and without shifting the burden to Thompson to disprove the testimony of the eyewitnesses. The instruction directly countermanded Thompson's attempt to attack the credibility of the eyewitnesses. In effect, it gave those witnesses' testimony the advantage of a ten-stroke handicap. Thompson's attack on the eyewitnesses' credibility was further undercut by the court's instructing the jury, in essence, to reconcile, as truthful, any conflicting testimony. The instruction to reconcile reinforced the given premise that all of the witnesses spoke the truth. *See Percy,* 595 A.2d at 251. If we assume, as we must, that the jury followed the instruction, *City of Grand Forks v. Cameron,* 435 N.W.2d 700 (N.D.1989), then we believe that, so directed, the jury abdicated its ultimate responsibility to ferret out the truth, and depended, instead, on the presumption. The case turned on whether the jury believed the accuracy of the eyewitnesses' identifications. Those eyewitnesses' credibility should have been subjected to a neutral appraisal, unfettered by the suggestiveness of the instruction in favor of the veracity of witnesses. Instead, the

eyewitnesses' accounts, based upon perceptions borne under circumstances that were fleeting, excited and stressful, were given special treatment by virtue of the presumption. Indeed, it may be prudent to give a cautionary instruction to scrutinize carefully the accuracy of eyewitness testimony. *See, e.g., Varner, supra* at 926 [noting that the trial court "instructed the jury that testimony of eyewitnesses must be scrutinized carefully to determine the accuracy of their identifications"]; Gary L. Wells & Donna M. Murray, *What Can Psychology Say About the* Neil v. Biggers *Criteria for Judging Eyewitness Accuracy?*, 68 J. Applied Psychol. 347, 360 (1983) ["[I]n order to handle adequately the issue of eyewitness confidence, some cautions regarding the limited utility of eyewitness certainty may be in order."]; *see also United States v. Wade*, 388 U.S. 218, 235, 87 S.Ct. 1926, 1936, 18 L.Ed.2d 1149 (1967) [discussing "the dangers inherent in eyewitness identification and the suggestibility inherent in the context of the pretrial identification"]; *State v. Fontaine*, 382 N.W.2d 374, 378 (N.D.1986) [upholding the trial court's decision permitting expert testimony "concerning the difficulty of eyewitnesses to properly identify persons"]; *United States v. Stevens*, 935 F.2d 1380, 1397–1400 (3rd Cir. 1991) [finding that expert testimony on particular weaknesses of eyewitness identifications would be helpful to the jury]. Applied to " 'the vagaries of eyewitness identification,' " *Fontaine, supra* at 381 (Meschke, J., concurring specially) (quoting *United States v. Wade*, 388 U.S. 218, 228, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967)), the erroneous instruction was a potential source of great mischief which we cannot say was harmless error.

We conclude that the instruction concerned a subject central to Thompson's case and prejudiced his substantial rights. Accordingly, we hold that the error was not harmless, and we reverse and remand this case for a new trial.

MESCHKE, NEUMANN and SANDSTROM, JJ., concur.

VANDE WALLE, Chief Justice, concurring specially.

In *Andrews v. O'Hearn*, 387 N.W.2d 716, 730 (N.D.1986), we upheld an instruction similar to the one given in this case. We noted that in the context of the entire instruction in *Andrews* "the presumption that a witness has told the truth is easily rebuttable; indeed, the other language places such broad discretion upon the jury that the presumption is dissipated almost out of existence."

The same rationale is advanced by the State to sustain the instruction given here. But *Andrews* was a civil case; because, in a criminal case, the State has the total burden of proof beyond a reasonable doubt, any "edge" belongs to the defendant, not the State. Insofar as the presumption of truth may provide an "edge" to the State's witnesses, I agree it should not be given.

The issue is easier when the evidence given by two witnesses is inexorably contradictory. It is less clear when the testimony may seem contradictory but can, in fact, be reconciled. Although that portion of the instruction on reconciling testimony if possible, is predicated on the presumption that each witness is presumed to tell the truth, I believe trial judges should continue to tell juries to reconcile the evidence if the jury can, and omit that portion of the instruction concerning the presumption of truth. To do otherwise is to instruct the jury that in the event of seemingly conflicting testimony from two witnesses, one must be telling the truth and the other witness must be lying. Many seeming conflicts in testimony can be reconciled. Not all conflicts are the result of the credibility or incredibility of the witnesses.

I do not understand the majority opinion to reject that portion of the instruction which requires the jury to reconcile conflicting evidence if it can and I therefore join the majority opinion.

NEUMANN, J., concurs.