**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Lila D. HANSON, also known as Diane Hanson, and Keyte Hanson,
Defendants–Appellants.**

Nos. 92–2244, 92–2246.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 4, 1993.

Decided June 2, 1993.

Eric J. Klumb, Asst. U.S. Atty. (argued), Susan M. Knepel, Office of U.S. Atty., Milwaukee, WI, for plaintiff-appellee.

James R. Lowe (argued), Thomas J. Arenz, Frisch Dudek, Ltd., Milwaukee, WI, for defendant-appellant Lila D. Hanson.

Charles H. Bohl (argued), Michael J. Collard, Frisch Dudek, Ltd., Milwaukee, WI, for defendant-appellant Keyte Hanson.

Before POSNER, FLAUM and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Keyte and Diane Hanson were convicted of filing incomplete income tax returns in violation of 26 U.S.C. § 7206(1). On appeal, the defendants argue that the district court's failure to admit certain testimony requires the reversal of their convictions. Finding that any error was harmless and that the defendants' other arguments lack merit, we affirm both convictions.

## I.

Keyte Hanson was an officer of Northwestern Mutual Life Insurance Company ("NML") and manager of its Education and Field Training Division ("EFTD"). Via the EFTD, NML ran a program which offered motivational books and tapes to its insurance agents. At the program's inception, an outside vendor purchased, packaged and shipped all the books and tapes ordered by NML agents. In the 1970s, the original outside vendor terminated its services, and an organization named Achievement Wise Associates ("AWA") took over the purchasing, shipping and handling needs of the NML program.

During 1985, 1986 and 1987, AWA netted at least $52,000 by performing these services for NML.[1] Apparently no one reported this income to the Internal Revenue Service ("IRS"). This case revolves around the question of who was responsible for reporting AWA's income. The government believed that Keyte Hanson and his wife, Diane, were responsible for reporting AWA's income and a federal grand jury agreed. On April 2, 1991, the Hansons were indicted for willfully failing to report AWA's income on their 1985, 1986 and 1987 tax returns.

At trial, the Hansons admitted that they had not reported AWA income, but claimed that they did not believe that it was their income to report. According to the Hansons, AWA was formed and operated by their six children to provide them with part-time jobs and money for college. The Hansons maintained that AWA's income was either paid to the children in cash or saved and subsequently used for their college educations.

The government presented quite a different picture. According to the prosecutor, Diane and Keyte formed AWA, played active roles in the business and deliberately concealed their involvement from NML. The following is a summary of the pertinent evidence the government introduced to support its theory.

Diane Hanson typed most of the invoices requesting payment from NML, transported book and tape shipments to the post office, signed all AWA checks, and had AWA bank statements sent to her attention. Keyte Hanson hand delivered all invoices to NML, and then approved them for payment in his capacity as EFTD manager. NML paid AWA by checks made payable to AWA, 52 Sunset Trail, Winneconne, Wisconsin.

According to Nancy Nedolyn, a NML employee, these checks were personally deliv-

---

1. The government and the Hansons disagree on the exact amount of profits earned by AWA. The Hansons claim they netted approximately $52,-000, while the government believes the correct amount is $78,000.

ered to Keyte Hanson. It was Ms. Nedolyn's understanding that because AWA was located some distance away, Keyte would meet an AWA representative halfway to deliver the checks. When Ms. Nedolyn asked Keyte for the name of the person responsible for AWA in order to complete some NML paperwork, she was told "Anna Kuhns, 52 Sunset Trail, Winneconne, Wisconsin." Mr. Hanson gave similar information to another NML employee. However, evidence at trial revealed that Anna and Gene Kuhns, who reside at 52 Sunset Trail, had never heard of AWA until the investigation of this case.

Mr. Hanson concealed other material facts about AWA from NML. All officers at NML were required to complete disclosure questionnaires designed to identify conflicts of interests between employee activities and NML goals. The questionnaires generally inquired into whether Mr. Hanson or any of his associates, including family members, engaged in certain types of businesses or received certain types of benefits from NML. Mr. Hanson never mentioned his family's involvement with AWA.

In 1987, NML began an internal investigation of its dealings with AWA. Auditors discovered that NML had paid AWA for Wisconsin sales taxes which, in turn, had never been paid to the State of Wisconsin. During an interview with auditors, Keyte stated that his family took over the company from Gene and Anna Kuhns. He told investigators that his wife received some payments, but primarily his children were paid. Mr. Hanson was reluctant to provide the auditors with documents such as invoices, bank statements and canceled checks. Among the materials Mr. Hanson finally produced was a check which he admitted altering. Mr. Hanson ultimately resigned from NML because of the conflict of interest.

An examination of AWA's bank statements showed that substantial amounts of money were paid over to Diane and Keyte. There was evidence that the Hansons used AWA funds to pay off credit cards, purchase an Audi automobile in Germany, and put a down payment on a $150,000 home in Winneconne, Wisconsin. In addition, the Hansons withdrew approximately $500 per month from AWA's account to cover household expenses.

As mentioned, the Hansons testified that AWA was not their business, but their children's, and therefore they believed that their tax returns were correct. Keyte Hanson testified that soon after the formation of AWA his wife asked him how AWA's income should be reported on their tax forms. Mr. Hanson told her that they did not have to report it because the income belonged to the children, and that once the profits were divided among six children, no tax was due.

In 1987, an accountant prepared the Hansons' tax returns and those of two of their children. Diane Hanson testified that she never mentioned AWA income to the accountant because she believed the income was the children's. Keyte Hanson did not tell the accountant about AWA income for purposes of his own returns or those of his children.

At the close of trial, the jury convicted both defendants. This timely consolidated appeal followed. The Hansons argue that the trial court committed reversible error by excluding testimony proffered by Mr. Hanson. The Hansons also claim that by refusing to permit Mr. Hanson to testify on a crucial subject, the trial court denied them their Fifth and Sixth Amendment rights. Finally, the Hansons believe that the trial court misled the jury during its preliminary instructions. Finding that none of the Hansons' challenges require reversal, we affirm both convictions.

## II.

In order to convict the Hansons, the government had to prove that they violated 26 U.S.C. § 7206(1), which penalizes any person who

> [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter
>
> . . . .

At trial, it was undisputed that the Hansons had not reported AWA income when they

should have done so; thus, the only issue was whether the Hansons knew that they should have reported the income when they omitted it. To prove that the Hansons had the requisite guilty states of mind, the government stressed two main facts: Mr. Hanson's activities designed to conceal his family's connection to AWA from his employer, and Keyte and Diane Hanson's use of AWA funds for their personal purposes.

Apparently Mr. Hanson had an explanation for one of his concealment activities. During direct examination, Mr. Hanson was asked why he did not reveal his family's ownership of AWA on NML's conflict disclosure form. In answering, Mr. Hanson started to describe a conversation he had with Bob Templin, a NML vice president, concerning the proper completion of the form. Mr. Hanson stated that he told Mr. Templin that "my children were providing a service to Northwestern Mutual, it was not a big deal." When Mr. Hanson attempted to relate Mr. Templin's response, the court sustained a hearsay objection by the government.

During a side bar, Mr. Hanson's counsel made the following proffer:

If Mr. Hanson had been allowed to continue to testify, he would have said that his superior had told him that he was not required to report on the conflict of interest form the circumstances that he had just related to the superior which he did testify about.... Hearsay is defined at Rule 801(c) as an out of court statement offered in evidence to prove the truth of the matter asserted.... [T]he evidence was not being offered for the truth but rather for the effect it had upon the state of mind of Mr. Hanson.

Further, counsel suggested that the court give a cautionary instruction. The court disagreed, concluding that the evidence was being offered for the truth of the matter. The Hansons maintain that the district court's decision was an error.

■ We review evidentiary rulings by the district court for an abuse of discretion. *United States v. Harris,* 942 F.2d 1125, 1130 (7th Cir.1991). However, even under this deferential standard of review, we conclude that the district court erred in this case.

Hearsay is an out of court statement offered for the truth of the matter asserted. FED. R.EVID. 801(c). In this case, the Hansons sought to introduce Mr. Templin's out of court statement that Mr. Hanson did not have to disclose his family's connections with AWA on the NML conflict form. However, by introducing such evidence, the Hansons were not trying to prove that Mr. Hanson, in fact, was not required to make a disclosure. Rather, the Hansons sought to use Mr. Templin's statement to show the effect it had on Mr. Hanson.

■ An out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay. *Harris,* 942 F.2d at 1130; *United States v. Moore,* 845 F.2d 683 (7th Cir.1988); *United States v. Norwood,* 798 F.2d 1094, 1097 (7th Cir.), *cert. denied,* 479 U.S. 1011, 107 S.Ct. 656, 93 L.Ed.2d 711 (1986). In *Harris,* the defendant had received more than a half a million dollars from a male paramour. She considered the money a nontaxable gift; the government disagreed and charged her with willfully failing to file income tax returns. 942 F.2d at 1130. At trial, the defendant proffered three letters from her lover in which he wrote that he loved her and loved giving her gifts. *Id.* We concluded that the district court erred in excluding the letters as hearsay, stating:

But the letters were not hearsay for the purpose of showing what Harris believed, because her belief does not depend on the actual truth of the matters asserted in the letters. Even if [her lover] were lying, the letters could have caused Harris to believe in good faith that the things he gave her were intended as gifts.... This good faith belief, in turn, would preclude any finding of willfulness on her part.

*Id.* (citations omitted).

The principle in the instant case is identical. It does not matter whether Mr. Templin was telling Mr. Hanson the truth when he told him he did not have to disclose his connections to AWA to NML. What matters is whether such a conversation caused Mr. Hanson to have a good faith belief that he did not have to disclose, which would allow

him to at least partially rebut the government's argument that he was concealing information about AWA from NML. Because the Hansons offered Mr. Templin's statement only to demonstrate its effect on Mr. Hanson's state of mind, we conclude that the proffered testimony was not hearsay and the district court erred in excluding it.

■ Needless to say, not all evidentiary errors require reversal. A conviction will stand if the district court's error was harmless. *United States v. Cerro*, 775 F.2d 908 (7th Cir.1985). A harmful error results only if the error had a "substantial and injurious effect or influence" on the jury's verdict. *United States v. Peak*, 856 F.2d 825, 834 (7th Cir.) (citations omitted), *cert. denied*, 488 U.S. 969, 109 S.Ct. 499, 102 L.Ed.2d 535 (1988). In making such a determination in a case where evidence has been improperly excluded, we will find the error harmless if "the evidence of guilt was overwhelming and the defendant was allowed to put on a defense, [even] if not quite so complete a defense as he might reasonably have desired." *Cerro*, 775 F.2d at 916. The Hansons contend that the evidence against them was not overwhelming and that they were unable to put on any defense. The Hansons believe that if the jury had heard Bob Templin's statement then they would not have been convicted. We are not convinced.

■ We believe the evidence against Mr. Hanson is overwhelming. First, he told NML that Anna and Gene Kuhns owned AWA, then he claimed to have bought AWA from them; both statements were untrue. In addition, there was evidence that Mr. Hanson altered a check and failed to pay Wisconsin sales tax. Most importantly, there was ample evidence that Mr. Hanson used AWA funds to purchase goods for himself and his family. By itself, this fact casts serious doubt on Mr. Hanson's claim that he believed the money belonged to his children.

We note that Mr. Hanson offered no explanations for his affirmative misrepresentations to NML or the altered check—either to the jury or to this court. Given Mr. Hanson's inability to justify his more egregious conduct, we cannot conclude that the jury's verdict would have been different had it heard Mr. Hanson explain why he failed to properly complete NML's conflict disclosure form.

Furthermore, Mr. Hanson presented evidence supporting his theory of defense. Specifically, a 1982 NML memo was introduced which showed that NML was aware that AWA was located at Keyte Hanson's home in 1982, a piece of evidence which clearly rebutted the government's concealment theory. Additionally, Mr. Hanson was permitted to testify that the children, not their parents, were running AWA for NML. Unlike *Peak*, in which the exclusion of the only evidence supporting the defendant's defense mandated reversal, here the excluded evidence would not have significantly enhanced Mr. Hanson's chosen, albeit unconvincing, defense. *See* 856 F.2d at 835.

We also conclude that the district court's error was harmless as to Mrs. Hanson. The fact that her husband was unable to testify to Bob Templin's statement had no effect on Mrs. Hanson's ability to present a defense. Mrs. Hanson's defense was that she believed that their tax returns were accurate because her husband told her that AWA's income did not need to be reported. There is no evidence that Mr. Hanson ever told his wife about his discussion with the vice president concerning the disclosure forms, and Mrs. Hanson has never claimed that she relied on her husband's tax conclusion because it was supported by Mr. Templin's statements.

Accordingly, we cannot say that the jury's verdict as to Mrs. Hanson would have been different if Mr. Templin's statement had been admitted. The purpose of Mr. Templin's statement was to rebut the government's argument that *Mr. Hanson* concealed the truth about AWA from NML. The government did not argue or prove that Mrs. Hanson had ever made false statements to NML. According to the evidence, Mrs. Hanson never talked with anyone at NML. The evidence of concealment was directed at Mr. Hanson's guilt, not his wife's. Although the government did argue that Mrs. Hanson helped conceal information from NML by covering the paper trail, this was a minor point in the government's case. Primarily, the government argued that Mrs. Hanson was an intelligent woman who could not have

truly believed that AWA income belonged to her children when she and her husband were using those funds to buy a car and a home.

The trial judge instructed the jury to consider the evidence against each defendant separately, and we presume the jury followed that instruction. *United States v. Briscoe*, 896 F.2d 1476, 1517 (7th Cir.), *cert. denied*, 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). Moreover, during closing argument, Mrs. Hanson's attorney stressed the fact that, since Mrs. Hanson never dealt with NML, the evidence of concealment had nothing to do with her. It appears that the jury convicted Mrs. Hanson because there was evidence that she knew AWA income should not have been omitted from their tax return, not because of Mr. Hanson's concealment activities. Under such circumstances, we conclude that the district court's error was harmless as to Mrs. Hanson.

The Hansons also argue that the trial court's exclusion of Mr. Templin's statement deprived Mr. Hanson of his Fifth and Sixth Amendment rights to testify on his own behalf, and deprived Mrs. Hanson of her Fifth and Sixth Amendment rights to present witnesses on her own behalf. Their arguments fail for two reasons. First, for the same reasons that the trial court's error was harmless, we conclude that the error did not amount to a deprivation of constitutional rights. *See Cerro*, 775 F.2d at 916. Second, even though the court excluded Mr. Hanson's recitation of Mr. Templin's statement, the Hansons were not prevented from calling Mr. Templin as a witness at trial. The defendants did not request a recess or continuance to enable them to call the vice president, and there is no evidence that he was unavailable to testify. The Hansons' Fifth and Sixth Amendment rights were not violated.

Finally, the Hansons contend that the trial court committed reversible error by misleading the jury with a definition of "reasonable doubt." After the jury was empaneled, the court gave preliminary instructions stating:

> Now, finally, the third cardinal principle so to speak of a criminal trial is that the government in proving the guilt of the defendants must do so beyond a reasonable doubt. And that's simply a doubt that's a reasoned doubt.

According to the Hansons, the trial judge's statement incorrectly told the jury that it could not consider subjective factors when deciding whether to convict the defendants. We disagree.

The trial court should not attempt to define reasonable doubt because "[a]n attempt to define reasonable doubt presents a risk without any real benefit." *United States v. Hall*, 854 F.2d 1036, 1039 (7th Cir.1988). *See also United States v. Glass*, 846 F.2d 386, 387 (7th Cir.1988); *United States v. Regilio*, 669 F.2d 1169, 1178 (7th Cir.), *cert. denied*, 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982). However, defining reasonable doubt does not result in *per se* reversible error; the defendant must show that the instruction was misleading or confusing. *Hall*, 854 F.2d at 1038; *Regilio*, 669 F.2d at 1178.

In *Regilio*, we held that the trial court's definition of a reasonable doubt as "a doubt based on reason" failed to confuse or mislead the jury. *Id.* Similarly, in the instant case, we do not believe that the "reasoned doubt" definition given by the trial court misled or confused the jury. *See also Hall*, 854 F.2d at 1039 ("equating reasonable doubt to fair doubt did not constitute reversible error"). Nor did the definition improperly limit the jury's ability to consider both subjective and objective factors during its deliberations. Further, we note that the trial judge did not repeat the definition of reasonable doubt in his final and written instructions to the jury prior to its deliberations. This fact assures us that the trial court's initial remark does not require reversal of the defendants' convictions. *See Gacy v. Welborn*, 994 F.2d 305, 307–08 (7th Cir. 1993) (correct written instructions cured "slip of the judicial tongue" in oral discussion).

### III.

For the foregoing reasons, we AFFIRM the convictions of Keyte and Diane Hanson.