In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 11-3822 & 11-3824

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

LACEY PHILLIPS and ERIN HALL,

*Defendants-Appellants*.

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 11-cr-12-bbc—**Barbara B. Crabb**, *Judge*.

ARGUED MAY 30, 2012—DECIDED AUGUST 2, 2012

Before EASTERBROOK, *Chief Judge*, and BAUER and POSNER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Lacey Phillips and Erin Hall decided to buy a house together. They asked Associated Bank for a mortgage loan. It said no, because Hall had a recent bankruptcy and the couple's joint income (approximately $3,800 a month) was too low for the loan they needed (more than $200,000). Phillips and Hall next turned to Brian Bowling, a mortgage broker. Bowling told

them that they could qualify under what he called the "stated income loan program"—his label for an approach designed to deceive lenders. Bowling prepared an application that omitted Hall's name (avoiding a credit check that would have revealed his bankruptcy), attributed the combined income of Hall and Phillips to Phillips alone, doubled that combined income, and falsely claimed that Phillips was a sales manager at a satellite TV business. (Bowling knew that the $90,000 annual income Phillips claimed to earn needed to match the job she claimed to hold; actually she was a hair stylist at J.C. Penney, with an annual income less than $24,000.) Phillips signed the application and an employment verification form. Fremont Investment & Loan extended credit, and the couple bought their home. But they could not keep up the payments, and the mortgage holder foreclosed. (There was a second mortgage too, but it need not be discussed.)

Bowling and associates at his firm Platinum Concepts repeated this process often enough that they were bound to be caught. He pleaded guilty to bank fraud and, in an effort to lower his own sentence, agreed to assist in the prosecution of his clients. Phillips and Hall were among the clients the United States prosecuted. A jury convicted them of violating 18 U.S.C. §1014, and the judge sentenced each to two months' imprisonment plus three years' supervised release and about $90,000 in restitution. Bowling is serving a sentence of 38 months.

Phillips and Hall contend that Bowling's statements provide them with a defense. The district judge barred

them from asking questions designed to elicit testimony that he assured them that the "stated income loan program" is lawful; the judge also foreclosed an argument that Phillips made a mistake of fact when signing the loan application and employment verification form. According to defendants, §1014 is a specific-intent crime, and they were hindered in showing the lack of intent. The district judge concluded, however, that Phillips and Hall sought to argue a mistake of law, not an error of fact or a lack of the required intent. The instructions required the jury to acquit unless it found beyond a reasonable doubt that Phillips and Hall knew that the statements on the application and form were false; a genuine mistake of fact would have led to acquittal. What Phillips and Hall really wanted to argue, the judge wrote, is that Bowling's false assurances about the legality of lying to lenders exculpate the lies; that would be a mistake-of-law defense, and "[t]he rule that 'ignorance of the law will not excuse' is deep in our law." *Lambert v. California*, 355 U.S. 225, 228 (1958) (citations omitted). Compare *United States v. Feola*, 420 U.S. 671, 687 (1975), with *Ratzlaf v. United States*, 510 U.S. 135, 149 (1994).

Section 1014 is a simple statute. It reads: "Whoever knowingly makes any false statement . . . for the purpose of influencing in any way the action of [any of a long list of entities, including federally insured lenders] shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." There are just three elements: (1) knowingly making a false statement; (2) to one of the listed entities; (3) for the purpose of influencing that entity. Phillips and Hall concede that the documents

contain many false statements, and the jury found that Phillips signed them knowing their contents to be false. Defendants concede that Fremont was among the entities listed in §1014. (We say "was" because that specialist in subprime credit collapsed in spring 2007, having made all too many loans to people who could not repay. Its failure was a harbinger of things to come.) That leaves "for the purpose of influencing in any way the action" of the lender. This can reasonably be described as a specific-intent element. But it is a *specific* specific-intent element. That is, it describes exactly the required mental state; it does not require proof that the defendant knew that his acts were unlawful. The bank fraud statute, 18 U.S.C. §1344, requires proof of intent to defraud; §1014 is a different animal, requiring only proof of intent to influence. See *United States v. Lane*, 323 F.3d 568, 582–85 (7th Cir. 2003).

Suppose Bowling had testified that he assured defendants that federal law allows them to deceive lenders. Such testimony would not have tended to negate the intent element in §1014. The statute does not require proof that the defendants knew their acts to have been unlawful or to constitute fraud; it requires only intent to influence the lender. Bowling set out to do exactly that: influence a lender, so that the "no" from Associated Bank would turn into a "yes" from someone else. Defendants' goal likewise was to find a way to influence a lender to put up the money so they could buy a house. The evidence of defendants' intent to influence a lender is strong; defendants themselves do not argue that the evidence is insufficient.

We do not know what Bowling would have testified had defense counsel been allowed to ask extra questions, but the prosecutor has not asked us to treat as a forfeiture the absence of an offer of proof. Fed. R. Evid. 103(a)(2). We therefore must assume that Bowling would have testified along the lines explored at oral argument.

Perhaps Bowling would have testified, for example, that he assured defendants that false statements about income and employment are permissible because banks don't care about the answers—that banks plan to sell or securitize the loans, so someone else will bear any loss. Bowling might have told Phillips and Hall that all lenders care about is having the paperwork *appear* to be in order, so that they can package the loans for resale. But if Bowling had testified in this fashion, it would not have helped the defense. It would not have negated the falsity of the statement (element 1), the identity of the lender (element 2), or the defendants' intent to influence the lender (element 3). Quite the contrary, it would have bolstered the prosecution's case by showing that Bowling led defendants to believe that false statements would *succeed* in influencing the lender, thus reinforcing proof of element 3. Testimony of this kind would have led defendants to believe that the lender would not verify the borrowers' claims about income and employment (as Fremont didn't verify them).

Negating the sort of defense Phillips and Hall wanted to offer may have been why the United States prosecuted under §1014 rather than §1344, which requires proof of intent to defraud. Negating this kind of defense also

may be why Congress enacted §1014. The argument that no wrong has been done because the loss will be passed along to someone else, such as a syndicate investing in securitized loans, or the Treasury via a guaranty, is short-sighted; the loss is still there, and the fact that it is borne by someone other than the immediate lender is a good reason to make it a crime to lie to influence a bank, *especially when* the bank does not care about the truth because it expects to shift the loss to a stranger. If it is a crime to make false statements that help banks "put the paperwork in apparent order", then there will be fewer un-sustainable loans and fewer losses to investors; credit will go to people who can repay, rather than the people most willing to exaggerate their income.

The sort of defense that Phillips and Hall wanted to make would have been relevant if §1014 required the false statement to be material. Many anti-fraud statutes, including §1344, require proof of materiality, a term that the Supreme Court understands to mean "'[having] a natural tendency to influence, or [being] capable of in-fluencing, the decision of' the . . . body to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988) (citations omitted). If Bowling had testified along the lines we have hypothesized, defendants could have argued that they lacked the intent to make a *material* misstatement, because Bowling led them to believe that the truth of what they put in the application would not matter to the lender.

Section 1014 does not require proof of materiality, however. That's the holding of *United States v. Wells*, 519

U.S. 482 (1997). Justice Stevens argued in dissent that the absence of a materiality requirement would make it a felony to flatter a bank official in the hope that he will reciprocate with a loan. 519 U.S. at 500–13. The majority did not deny this consequence; it said only that prosecution for "trivial or innocent conduct" (*id*. at 498) would be unusual, and it reiterated that a person who "knows the falsity of what he says and intends to influence the institution" (*id.* at 499) violates §1014. Statements that a bank would view as trivial probably won't influence it, and such statements therefore will not be made for the purpose of influencing it. But Phillips and Hall misrepresented their income, and Phillips's employment, knowing (if only because Bowling told them) that such details *do* influence lenders. They were right; Fremont made the loan even though Associated Bank, which knew the truth, refused. And because defendants knew the statements to be false (so the jury found), they violated §1014 whether or not they could have been convicted of violating §1344.

Phillips and Hall are not the first defendants to argue that they should be acquitted because, although they lied to a bank, they thought that the bank cared only about paperwork and not about the truth of their representations. When seeking a loan, Vincent Lane lied about his net worth. In his prosecution under §1014, Lane contended that the bank actually knew the truth and didn't care about it (beyond wanting the paperwork to look good); according to Lane, the bank cared only about a third party's guaranty of the indebtedness. The district court excluded evidence that would have sup-

ported Lane's position, just as the district court here excluded evidence about what Bowling told Phillips and Hall. We affirmed, holding that making false statements to make paperwork look good, and thus be acceptable to a bank, violates §1014 even if the bank does not give a hoot about the statements' truth. 323 F.3d at 582–85.

Defendants reply that although materiality is not an element of the §1014 offense, "subjective materiality" (Reply Br. 12, 14, 16) is—and that as a result of Bowling's statements they lacked "subjective materiality." We don't follow this. When materiality is an element of a crime, then the prosecutor must show that the defendant intended to make a material statement; that's a subjective inquiry. But when materiality is not an element—as it is not under §1014—then the defendant's beliefs about materiality are irrelevant. The prosecution must show whatever mental states matter to the statutory elements. For §1014, this means knowledge of falsity and intent to influence the lender. What Phillips and Hall thought or believed about other matters, such as materiality, is no more relevant than whether Phillips and Hall thought that the loan would contribute to tax evasion, air pollution, or any other element of some other statute. The district court's order limiting the subjects on which Bowling could testify therefore was proper.

AFFIRMED

POSNER, *Circuit Judge*, dissenting. The defendants are entitled to a new trial. At the government's urging, the trial judge erroneously excluded, as irrelevant, evidence that might have convinced the jury that the defendants had not made statements that they knew to be false or that, knowing them to be false, yet had not made them "for the purpose of influencing in any way the [bank's] action" on their mortgage application. 18 U.S.C. § 1014. The judge ruled that if mortgage applicants "sign something and they send it in, they're attempting to influence the bank . . . . They didn't sign these papers just to put them up on their wall. They signed these papers with the idea that they would go into whoever and they would get a mortgage . . . . [If defendant Phillips] just took the papers and went home, we would not have a crime. But by sending them in to the mortgage company, she's met the requirements of 1014."

I am not suggesting that the evidence presented by the government was insufficient for a conviction, only that evidence that could have persuaded the jury that the defendants' guilt had not been proved beyond a reasonable doubt was erroneously excluded. In the passage that I just quoted, the judge implied that making a false statement that influences a bank is a crime. It isn't. The statement must be knowingly false. The judge excluded evidence that if believed would have negated that element—and would also have undermined the inference of intent to influence the bank. Nor am I suggesting that the jury was erroneously instructed. The point rather is that the judge's misunderstanding of

the statute led her to exclude evidence that might have exonerated the defendants.

The statute punishes "whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of" the various entities listed in the statute, which includes federally insured banks and other lenders. The statute doesn't say "whoever knowingly makes a false statement in a loan application or other document submitted to a bank is, without more, punishable." The application *as a whole* is bound to be intended to influence the bank's decision, but that doesn't mean that every knowingly false statement in it is intended to influence the bank. The critical phrase "for the purpose of influencing" refers to the "false statement," not to the application as a whole. Suppose you're an actress and you habitually subtract three years from your true age because you're worried about movie producers' discriminating against aging actresses. You're 40 but pretend to be 37. You know the bank doesn't care whether you're 40 or 37—you're wealthy and the bank is eager to have you as a customer—but you don't like your true age to appear on any document, because a bank employee might read it and discover the lie and post his discovery on Facebook or Twitter and within hours the whole world would be privy to the shameful truth. You made a knowingly false statement on your bank application by listing your age as 37 and rather than just pinning the application to your wall you submitted it to the bank. Under the district judge's interpretation of section 1014—an interpretation that warped

the trial—you would be guilty of a felony punishable by a prison sentence of up to 30 years and a maximum fine of up to $1,000,000.

What is true is that if a defendant makes a knowingly false statement intending to influence a bank, it is no defense that he didn't succeed in influencing it or even that he couldn't have succeeded. Materiality is not an element of the offense punished by section 1014. *United States v. Wells*, 519 U.S. 482, 484 (1997). Materiality is relevant, however, because if the defendant is under the impression that his falsehood would not influence the bank, it would be unlikely that his purpose in making it had been to influence the bank; what is the point of making an effort to attain what one knows is unattainable?

The Supreme Court recognized this in *Wells* when it said that "a statement made 'for the purpose of influencing' a bank will not usually be about something a banker would regard as trivial, and 'it will be relatively rare that the Government will be able to prove that' a false statement 'was . . . made with the subjective intent' of influencing a decision unless it could first prove that the statement has 'the natural tendency to influence the decision.' Hence the literal reading of the statute will not normally take the scope of § 1014 beyond the limit that a materiality requirement would impose." *Id.* at 499, quoting *Kungys v. United States*, 485 U.S. 759, 780-81 (1988). Thus, the Court declined to read a requirement of proving materiality into the statute not because materiality is irrelevant but because "the

literal reading of the statute" (the reading that ex-
cludes materiality as an element of the offense) allows im-
materiality to be used as evidence that the false state-
ment was not intended to influence the bank.

If the defendants believed that all the bank cared about
was that the applicant for a loan have a good credit
rating, which defendant Phillips, the mortgage ap-
plicant, did, they could not have believed that even the
statement of income would influence the bank's decision
any more than pinning Phillips's baby pictures to the
application would have influenced it. And if one
believes the defendants' version of what their mortgage
broker told them—a version they were forbidden to
present to the jury—they didn't think that including in
the space for "borrower's income" a non-borrower's
income would affect the bank's decision, as all the bank
cared about was the total income available to service
the loan and the non-borrower was the applicant's "sig-
nificant other" and future spouse. What can it mean to
intend to influence a bank by telling it something
you're confident won't influence it?

The defendants were a financially unsophisticated
couple (a hairdresser and a barber) who wanted to
buy a house. They had never owned a home and were
unfamiliar with the mortgage application process. Like
countless American couples during the housing bubble
they found a house they mistakenly thought they could
afford and applied to a bank for a mortgage. The bank
turned them down because of defendant Hall's poor
credit record. They turned next to a mortgage broker

named Bowling, whom Hall was acquainted with and admired. That was in 2006, as the housing bubble was about to burst. Unbeknownst to the defendants, Bowling was a crook who brokered fraudulent loans—indeed who contributed to the financial crisis triggered by the bubble's bursting. He found an unscrupulous (soon to be notorious) bank, Fremont Investment & Loan, willing to lend to impecunious suckers. Had Fremont been the bank that had turned the defendants down before they turned to Bowling for help in getting a mortgage, this would have been evidence that they realized they didn't meet the bank's criteria for a loan and so would be able to qualify for a loan only by lying. But it was a different bank.

Fremont was willing to make a "stated income" loan—indeed, such loans were its specialty. Stated-income loans are known to the knowing as "liars' loans," because in a stated-income loan the lender accepts the borrower's statement of his income without making any effort to verify it. Such loans, which played a significant role in the financial collapse of September 2008—the doleful consequences of which continue to plague the U.S. and world economies—were profitable because lenders sold them as soon as they'd made them and so avoided the high risk of default. Many of the loans were repackaged by the buyers into ill-fated mortgage-backed securities whose holders lost their shirts.

The defendants soon lost their house. Despite valiant efforts to keep up their mortgage payments by working

second jobs, they were unable to make the monthly payments of principal and interest required by the terms of the mortgage. The interest rate was an adjustable rate that reset automatically after two years; doubtless it reset at a higher rate ("a large majority of Fremont's subprime loans [the loan to the defendants was subprime] were adjustable rate mortgage (ARM) loans, which bore a fixed interest rate for the first two or three years, and then adjusted every six months to a considerably higher variable rate for the remaining period of what was generally a thirty year loan." *Commonwealth v. Fremont Investment & Loan*, 897 N.E.2d 548, 552 (Mass. 2008). Though hapless victims of Bowling, the defendants were convicted in part on the basis of his testimony at their trial; for he turned state's evidence and was rewarded for helping to convict his victims by being given a big slice off his sentence. (The exercise of prosecutorial discretion in this case was abysmal, but that is not our business.)

The defendants wanted to be allowed to testify that Bowling had told them, first, that defendant Phillips should be the only applicant for the stated-income loan because her credit history was good and Hall's was bad; second, that Hall's income should be added to hers on the line in the application that asked for the borrower's gross monthly income; and third, that this was proper in the case of a stated-income loan because what the bank was asking for was the *total* income from which the loan would be repaid rather than just the borrower's personal income. Phillips and Hall were a couple. They were not married when they applied for

the loan—but many couples are not married nowadays. (They have since married.)

The judge forbade the defendants to testify to these things because she couldn't see the relevance of such testimony. The government adds that it would have been hearsay. Not so (a surprising mistake for a Justice Department lawyer to make). The defendants were offering the testimony about Bowling's alleged statements not to prove that a stated-income loan *does* permit what Bowling told them it did, but to explain what they had believed when they made the application. It is not hearsay to testify to what someone told you and what you thought he meant, as long as it's not evidence about "the truth of the matter asserted in the [out-of-court] statement." Fed. R. Evid. 801(c); *Talmage v. Harris*, 486 F.3d 968, 975 (7th Cir. 2007); *United States v. Hanson*, 994 F.2d 403, 406–07 (7th Cir. 1993); *United States v. Thompson*, 279 F.3d 1043, 1047 (D.C. Cir. 2002). The defendants wanted to testify not that Bowling had told them the truth but that his lies had made them misunderstand the meaning of "borrower's income" in an application for a stated-income loan.

The evidence they were prevented from giving was pertinent both to whether they had knowingly made a false statement and whether if so they had done so in order to influence the bank to grant them a mortgage—the two key elements of the offense for which they were being tried. They wanted to testify that Bowling had told them that in a stated-income loan the line for the borrower's income on the application form

really means the borrower's income plus the income of a spouse, or parent, or a person one is cohabiting with in advance of intended marriage, or anyone else whose income will be an additional source of repayment of the mortgage. On this interpretation, which financial naïfs like these defendants could believe, they weren't trying to influence the bank by means of a *false* statement, because on that interpretation all the bank was asking for in the line for borrower's income was the total income out of which the mortgage would be repaid. The defendants must have known that in a literal sense Hall's income was not part of the borrower's, Phillips's, income. But literal meanings are not the only true meanings of phrases or sentences or other linguistic units. In light of Bowling's explanation to which the defendants were not permitted to testify, his gulls could well believe that when the bank asked for borrower's income it meant borrower's income *or* combined income if someone else's income could if necessary be used to meet the borrower's mortgage obligations. Or that "personal gross income" is a term of art meaning spouses' combined income. Lay persons often believe—and often with reason—that the meaning of a statement in a legal document is not ordinary meaning, but legal or commercial jargon.

Indeed the bank *may* have been asking for either an individual's income or a combined income. Fremont was a notorious high-flying subprime lender. It went broke in June of 2008—a harbinger of the worldwide financial collapse that occurred three months later when Lehman Brothers suddenly declared bankruptcy. See *Common-*

*wealth v. Fremont Investment & Loan*, *supra*, 897 N.E.2d at 551–55; *In re Fremont Investment & Loan*, Docket No. FDIC-07-035b (FDIC Order to Cease and Desist, Mar. 7, 2007), www.fdic.gov/bank/individual/enforcement/2007-03-00.pdf (visited July 30, 2012); Megan Woolhouse, "Lender Settles with State for $10m," *Boston Globe* (June 10, 2009) (the "very terms [of Fremont's loans]—short-term interest rates followed by payment shock, plus high loan-to-value and high debt-to-income ratios—were likely to lead to default and foreclosure"); "U.S. Regulators Order Fremont Investment & Loan to Tighten Its Loan Policies and Operations," *New York Times* (Mar. 8, 2007).

A reasonable jury, if permitted, as the jury in this case should have been, to consider the evidence of what Bowling told Phillips and what she believed, might have decided that she was trying to influence the bank not by concealing Hall (with his bad credit record) but by reporting an income from which the mortgage would be repaid that was large enough to persuade the bank that the loan would not be unduly risky. As long as the loan application asked for that measure of income, she was trying to influence the bank by means of a statement that she believed to be true.

The jury rendered a general verdict, simply finding the defendants guilty of both counts of the indictment (the section 1014 count and a count charging the defendants with having conspired to violate section 1014). The verdict did not reveal *what* false statements the jury attributed to the defendants. For all we can know, the only false statement to the bank that the jury found that

Phillips *and* Hall had known to be false (given that Hall hadn't signed the application and that neither of the defendants may have read it) was the statement of income in the borrower's line on the form—for they'd admitted to having combined their incomes on that line, but denied knowledge of the other exaggerations (see next paragraph). Those they attributed to Bowling; and since they weren't permitted to explain themselves, the jury had no choice but to convict them on the basis of the income statement alone.

It's true that the combined income was inflated on the application and that Phillips's job was falsely listed as that of a sales manager rather than a hairdresser to make the income figure credible. Philipps testified, however, that the form was filled out by Bowling and that neither she nor Hall read it or was aware of the inaccuracies in it. Bowling had told them about adding Hall's income to hers in the line for the borrower's income but not that he would inflate their combined income or misrepresent her job. The government does not argue that by signing the form she adopted the false statements in it that she was unaware of, nor would that be a plausible reading of a criminal statute that forbids only false statements made "knowingly." It is careless to sign a document without reading it, but it is a knowing adoption of its contents only if the signer is playing the ostrich game ("willful blindness"), that is, not reading it *because* of what she knows or suspects is in it. *In re Aimster Copyright Litigation*, 334 F.3d 643, 650 (7th Cir. 2003); *United States v. Azubike*, 564 F.3d 59, 66–67 (1st Cir. 2009); *United States v. Aina-Marshall*, 336 F.3d 167, 170–71 (2d Cir. 2003).

There are other grounds on which the jury might have convicted the defendants, but they are very weak. For example, because Hall didn't sign the application form, the bank could not have sought a deficiency judgment against him when the mortgage was defaulted. But deficiency judgments are rarely sought in Wisconsin, because under Wisconsin law if you foreclose within six months, as mortgagees like to do, you can't get a deficiency judgment. Wis. Stat. 846.101. And what bank would bother to seek a deficiency judgment against a barber? And anyway Fremont was not a conventional bank. Its business model was to sell the mortgages it issued, not to administer and if necessary foreclose on them.

To summarize: the district court's key error was to prevent testimony about what Bowling said to the defendants when he directed them to sign the submission to the bank. He may have said to them: "Your application isn't illegal," Or: "Whatever you write on it won't affect the bank's lending decision because it doesn't scrutinize the applications." Or: "Combining your income isn't a misstatement under Fremont's stated-income loan program." The first statement would not have helped the defendants because mistake of law is not a defense. The second statement, however, would have supported the defense of no intent to influence and the third would have been rebuttal to the prosecution's claim that they had knowingly made a false statement to the bank.

8-2-12