POSNER, Circuit Judge,
dissenting.
The defendants are entitled to a new trial. At the government’s urging, the trial judge erroneously excluded, as irrelevant, evidence that might have convinced the jury that the defendants had not made statements that they knew to be false or that, knowing them to be false, yet had not made them “for the purpose of influencing in any way the [bank’s] action” on their mortgage application. 18 U.S.C. § 1014. The judge ruled that if mortgage appli *806 cants “sign something and they send it in, they’re attempting to influence the bank.... They didn’t sign these papers just to put them up on their wall. They signed these papers with the idea that they would go into whoever and they would get a mortgage.... [If defendant Phillips] just took the papers and went home, we would not have a crime. But by sending them in to the mortgage company, she’s met the requirements of 1014.”
I am not suggesting that the evidence presented by the government was insufficient for a conviction, only that evidence that could have persuaded the jury that the defendants’ guilt had not been proved beyond a reasonable doubt was erroneously excluded. In the passage that I just quoted, the judge implied that making a false statement that influences a bank is a crime. It isn’t. The statement must be knowingly false. The judge excluded evidence that if believed would have negated that element — and would also have undermined the inference of intent to influence the bank. Nor am I suggesting that the jury was erroneously instructed. The point rather is that the judge’s misunderstanding of the statute led her to exclude evidence that might have exonerated the defendants.
The statute punishes “whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of’ the various entities listed in the statute, which include federally insured banks and other lenders. The statute doesn’t say “whoever knowingly makes a false statement in a loan application or other document submitted to a bank is, without more, punishable.” The application as a whole is bound to be intended to influence the bank’s decision, but that doesn’t mean that every knowingly false statement in it is intended to influence the bank. The critical phrase “for the purpose of influencing” refers to the “false statement,” not to the application as a whole. Suppose you’re an actress and you habitually subtract three years from your true age because you’re worried about movie producers’ discriminating against aging actresses. You’re 40 but pretend to be 37. You know the bank doesn’t care whether you’re 40 or 37— you’re wealthy and the bank is eager to have you as a customer — but you don’t like your true age to appear on any document, because a bank employee might read it and discover the lie and post his discovery on Facebook or Twitter and within hours the whole world would be privy to the shameful truth. You made a knowingly false statement on your bank application by listing your age as 37 and rather than just pinning the application to your wall you submitted it to the bank. Under the district judge’s interpretation of section 1014 — an interpretation that warped the trial — you would be guilty of a felony punishable by a prison sentence of up to 30 years and a maximum fine of up to $1,000,000.
What is true is that if a defendant makes a knowingly false statement intending to influence a bank, it is no defense that he didn’t succeed in influencing it or even that he couldn’t have succeeded. Materiality is not an element of the offense punished by section 1014. United States v. Wells, 519 U.S. 482, 484, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997). Materiality is relevant, however, because if the defendant is under the impression that his falsehood would not influence the bank, it would be unlikely that his purpose in making it had been to influence the bank; what is the point of making an effort to attain what one knows is unattainable?
The Supreme Court recognized this in Wells when it said that “a statement made ‘for the purpose of influencing’ a bank will *807 not usually be about something a banker would regard as trivial, and ‘it will be relatively rare that the Government will be able to prove that’ a false statement ‘was ... made with the subjective intent’ of influencing a decision unless it could first prove that the statement has ‘the natural tendency to influence the decision.’ Hence the literal reading of the statute will not normally take the scope of § 1014 beyond the limit that a materiality requirement would impose.” Id. at 499, 117 S.Ct. 921, quoting Kungys v. United States, 485 U.S. 759, 780-81, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988). Thus, the Court declined to read a requirement of proving materiality into the statute not because materiality is irrelevant but because “the literal reading of the statute” (the reading that excludes materiality as an element of the offense) allows immateriality to be used as evidence that the false statement was not intended to influence the bank.
If the defendants believed that all the bank cared about was that the applicant for a loan have a good credit rating, which defendant Phillips, the mortgage applicant, did, they could not have believed that even the statement of income would influence the bank’s decision any more than pinning Phillips’s baby pictures to the application would have influenced it. And if one believes the defendants’ version of what their mortgage broker told them — a version they were forbidden to present to the jury — they didn’t think that including in the space for “borrower’s income” a non-borrower’s income would affect the bank’s decision, as all the bank cared about was the total income available to service the loan and the non-borrower was the applicant’s “significant other” and future spouse. What can it mean to intend to influence a bank by telling it something you’re confident won’t influence it?
The defendants were a financially unsophisticated couple (a hairdresser and a barber) who wanted to buy a house. They had never owned a home and were unfamiliar with the mortgage application process. Like countless American couples during the housing bubble they found a house they mistakenly thought they could afford and applied to a bank for a mortgage. The bank turned them down because of defendant Hall’s poor credit record. They turned next to a mortgage broker named Bowling, whom Hall was acquainted with and admired. That was in 2006, as the housing bubble was about to burst. Unbeknownst to the defendants, Bowling was a crook who brokered fraudulent loans — indeed who contributed to the financial crisis triggered by the bubble’s bursting. He found an unscrupulous (soon to be notorious) bank, Fremont Investment & Loan, willing to lend to impecunious suckers. Had Fremont been the bank that had turned the defendants down before they turned to Bowling for help in getting a mortgage, this would have been evidence that they realized they didn’t meet the bank’s criteria for a loan and so would be able to qualify for a loan only by lying. But it was a different bank.
Fremont was willing to make a “stated income” loan — indeed, such loans were its specialty. Stated-income loans are known to the knowing as “liars’ loans,” because in a stated-income loan the lender accepts the borrower’s statement of his income without making any effort to verify it. Such loans, which played a significant role in the financial collapse of September 2008 — the doleful consequences of which continue to plague the U.S. and world economies— were profitable because lenders sold them as soon as they’d made them and so avoided the high risk of default. Many of the loans were repackaged by the buyers into ill-fated mortgage-backed securities whose holders lost their shirts.
*808 The defendants soon lost their house. Despite valiant efforts to keep up their mortgage payments by working second jobs, they were unable to make the monthly payments of principal and interest required by the terms of the mortgage. The interest rate was an adjustable rate that reset automatically after two years; doubtless it reset at a higher rate (“a large majority of Fremont’s subprime loans [the loan to the defendants was subprime] were adjustable rate mortgage (ARM) loans, which bore a fixed interest rate for the first two or three years, and then adjusted every six months to a considerably higher variable rate for the remaining period of what was generally a thirty year loan.” Commonwealth v. Fremont Investment & Loan, 452 Mass. 733, 897 N.E.2d 548, 552 (2008).) Though hapless victims of Bowling, the defendants were convicted in part on the basis of his testimony at their trial; for he turned state’s evidence and was rewarded for helping to convict his victims by being given a big slice off his sentence. (The exercise of prosecutorial discretion in this case was abysmal, but that is not our business.)
The defendants wanted to be allowed to testify that Bowling had told them, first, that defendant Phillips should be the only applicant for the stated-income loan because her credit history was good and Hall’s was bad; second, that Hall’s income should be added to hers on the line in the application that asked for the borrower’s gross monthly income; and third, that this was proper in the case of a stated-income loan because what the bank was asking for was the total income from which the loan would be repaid rather than just the borrower’s personal income. Phillips and Hall were a couple. They were not married when they applied for the loan — but many couples are not married nowadays. (They have since married.)
The judge forbade the defendants to testify to these things because she couldn’t see the relevance of such testimony. The government adds that it would have been hearsay. Not so (a surprising mistake for a Justice Department lawyer to make). The defendants were offering the testimony about Bowling’s alleged statements not to prove that a stated-income loan does permit what Bowling told them it did, but to explain what they had believed when they made the application. It is not hearsay to testify to what someone told you and what you thought he meant, as long as it’s not evidence about “the truth of the matter asserted in the [out-of-court] statement.” Fed.R.Evid. 801(c); Talmage v. Harris, 486 F.3d 968, 975 (7th Cir.2007); United States v. Hanson, 994 F.2d 403, 406-07 (7th Cir.1993); United States v. Thompson, 279 F.3d 1043, 1047 (D.C.Cir.2002). The defendants wanted to testify not that Bowling had told them the truth but that his lies had made them misunderstand the meaning of “borrower’s income” in an application for a stated-income loan.
The evidence they were prevented from giving was pertinent both to whether they had knowingly made a false statement and whether if so they had done so in order to influence the bank to grant them a mortgage — the two key elements of the offense for which they were being tried. They wanted to testify that Bowling had told them that in a stated-income loan the line for the borrower’s income on the application form really means the borrower’s income plus the income of a spouse, or parent, or a person one is cohabiting with in advance of intended marriage, or anyone else whose income will be an additional source of repayment of the mortgage. On this interpretation, which financial naifs like these defendants could believe, they weren’t trying to influence the bank by means of a false statement, because on that interpretation all the bank was asking *809 for in the line for borrower’s income was the total income out of which the mortgage would be repaid. The defendants must have known that in a literal sense Hall’s income was not part of the borrower’s, Phillips’s, income. But literal meanings are not the only true meanings of phrases or sentences or other linguistic units. In light of Bowling’s explanation to which the defendants were not permitted to testify, his gulls could well believe that when the bank asked for borrower’s income it meant borrower’s income or combined income if someone else’s income could if necessary be used to meet the borrower’s mortgage obligations. Or that “personal gross income” is a term of art meaning spouses’ combined income. Lay persons often believe — and often with reason — that the meaning of a statement in a legal document is not ordinary meaning, but legal or commercial jargon.
Indeed the bank may have been asking for either an individual’s income or a combined income. Fremont was a notorious high-flying subprime lender. It went broke in June of 2008 — a harbinger of the worldwide financial collapse that occurred three months later when Lehman Brothers suddenly declared bankruptcy. See Commonwealth v. Fremont Investment & Loan, supra, 897 N.E.2d at 551-55; In re Fremont Investment & Loan, Docket No. FDIC07-035b (FDIC Order to Cease and Desist, Mar. 7, 2007), www.fdic.gov/bank/ individua]/enforcement/2007-03-00.pdf (visited July 30, 2012); Megan Woolhouse, “Lender Settles with State for $10m,” Boston Globe (June 10, 2009) (the “very terms [of Fremont’s loans] — short-term interest rates followed by payment shock, plus high loan-to-value and high debt-to-income ratios — were likely to lead to default and foreclosure”); “U.S. Regulators Order Fremont Investment & Loan to Tighten Its Loan Policies and Operations,” New York Times (Mar. 8, 2007).
A reasonable jury, if permitted, as the jury in this case should have been, to consider the evidence of what Bowling told Phillips and what she believed, might have decided that she was trying to influence the bank not by concealing Hall (with his bad credit record) but by reporting an income from which the mortgage would be repaid that was large enough to persuade the bank that the loan would not be unduly risky. As long as the loan application asked for that measure of income, she was trying to influence the bank by means of a statement that she believed to be true.
The jury rendered a general verdict, simply finding the defendants guilty of both counts of the indictment (the section 1014 count and a count charging the defendants with having conspired to violate section 1014). The verdict did not reveal what false statements the jury attributed to the defendants. For all we can know, the only false statement to the bank that the jury found that Phillips and Hall had known to be false (given that Hall hadn’t signed the application and that neither of the defendants may have read it) was the statement of income in the borrower’s line on the form — for they’d admitted to having combined their incomes on that line, but denied knowledge of the other exaggerations (see next paragraph). Those they attributed to Bowling; and since they weren’t permitted to explain their understanding of borrower’s income, the jury had no choice but to convict them on the basis of the income statement alone.
It’s true that the combined income was inflated on the application and that Phillips’s job was falsely listed as that of a sales manager rather than a hairdresser to make the income figure credible. Phillips testified, however, that the form was filled out by Bowling and that neither she nor Hall read it or was aware of the inaccuracies in it. Bowling had told them about *810 adding Hall’s income to hers in the line for the borrower’s income but not that he would inflate their combined income or misrepresent her job. The government does not argue that by signing the form she adopted the false statements in it that she was unaware of, nor would that be a plausible reading of a criminal statute that forbids only false statements made “knowingly.” It is careless to sign a document without reading it, but it is a knowing adoption of its contents only if the signer is playing the ostrich game (“willful blindness”), that is, not reading it because of what she knows or suspects is in it. In re Aimster Copyright Litigation, 334 F.3d 643, 650 (7th Cir.2003); United States v. Azubike, 564 F.3d 59, 66-67 (1st Cir.2009); United States v. Aina-Marshall, 336 F.3d 167, 170-71 (2d Cir.2003).
There are other grounds on which the jury might have convicted the defendants, but they are very weak. For example, because Hall though a de facto applicant didn’t sign the application form, the bank could not have sought a deficiency judgment against him when the mortgage was defaulted. But deficiency judgments are rarely sought in Wisconsin, because under Wisconsin law if you foreclose within six months, as mortgagees like to do, you can’t get a deficiency judgment. Wis. Stat. 846.101. And what bank would bother to seek a deficiency judgment against a barber? And anyway Fremont was not a conventional bank. Its business model was to sell the mortgages it issued, not to administer and if necessary foreclose on them.
To summarize: the district court’s key error was to prevent testimony about what Bowling said to the defendants when he directed them to sign the submission to the bank. He may have said to them: “Your application isn’t illegal,” Or: ‘Whatever you write on it won’t affect the bank’s lending decision because it doesn’t scrutinize the applications.” Or: “Combining your income isn’t a misstatement under Fremont’s stated-income loan program.” The first statement would not have helped the defendants because mistake of law is not a defense. The second statement, however, would have supported the defense of no intent to influence and the third would have been rebuttal to the prosecution’s claim that they had knowingly made a false statement to the bank.